BECK *v.* RAILWAY TEAMSTERS' PROTECTIVE UNION.

| 118 | 497 |
| s77NW | 13 |
| s74ASR | 421 |
| 129 | 360 |
| 118 | 497 |
| 140 | 549 |
| 118 | 497 |
| 148 | 4634 |
| 118 | 497 |
| f149 | 135 |
| 149 | 136 |
| 118 | 497 |
| 156 | 4388 |

**1. EMPLOYER AND EMPLOYÉ — TRADES UNIONS — INTERFERENCE WITH PRIVATE BUSINESS.**

The law will protect employers against the unlawful interference of trades unions in their right to employ whom they please, at such prices as they and the persons employed can agree upon, and to discharge them at the expiration of their terms of service or for violation of their contracts.

**2. SAME — RIGHTS OF WORKINGMEN — LEGALITY OF ORGANIZATION.**

Organization into unions by workingmen for the securing of better and uniform wages, and the use of persuasion to induce other workingmen to join the union, and to refuse to work except for the established wage, and the presentation of their cause to the public in newspapers or circulars, in a peaceable way and with no attempt at coercion, are lawful.

**3. SAME — BOYCOTT.**

But the boycotting of one who refuses to accede to the demands of the union is unlawful, where the means used to prevent persons from dealing with the person boycotted are threatening in their nature, and tend naturally to overcome, by fear of loss of property, the will of others, and compel them to do what they would not otherwise do, though unaccompanied by actual violence or threats of violence.

**4. SAME — REMEDY BY INJUNCTION.**

Injunction will lie to restrain a combination of persons from attempting to ruin complainant's business by bringing to bear upon his customers and employés intimidating and coercive means.

118 MICH.—32.

5. SAME—PICKETING OF PREMISES—BOYCOTT CIRCULARS.

    The picketing of the premises of a person boycotted, for the purpose of intercepting his customers and employés, and the distribution of "boycott circulars," containing statements wholly false as to his relations with his employés, pursuant to an avowed intention of ruining his business, though carried out without violence, are, in themselves, acts of coercion which may be enjoined.

6. SAME—FREE SPEECH—CONSTITUTIONAL LAW.

    The duty of equity to enjoin the distribution of boycott circulars under such circumstances is not modified by the fact that under ordinary circumstances, where the destruction of property rights by coercive means is not involved, it cannot, under the Constitution (Const. Mich. art. 4, § 42), enjoin the publication of a libel.

Appeal from Wayne; Hosmer, J. Submitted June 15, 1898. Decided November 15, 1898.

Bill by Jacob Beck and others, copartners as Jacob Beck & Sons, against the Railway Teamsters' Protective Union, the Detroit Council of Trades and Labor Unions, George Innis, and others, to enjoin the boycotting of complainants' business. From a decree enjoining merely the use of violence or threats of violence, complainants appeal. Modified.

In order that there may be no misunderstanding of the issues involved we give the bill of complaint substantially in full:

"(1) Complainants are partners doing business in the city of Detroit, under the name of Jacob Beck & Sons, having their mill and place of business at 245, 247, 249, and 251 West Congress street. At their place of business, on West Congress street, aforesaid, they carry on a general milling business, namely, of manufacturing and milling cereal products. They also deal in oats, grain, meal, and other cereals, and have had for years a large trade established in the city of Detroit and elsewhere. In carrying on such business they always use a number of horses, trucks, and wagons for use in trucking and carrying from the elevators, the cars, and elsewhere the different cereals

which they use in the process of manufacture and sale, and also in delivering said cereals, either manufactured or unmanufactured, to the elevators, cars, and other customers in the city of Detroit and elsewhere.

" (2) Complainants have built up and established a large and valuable city trade, and have a large number of regular customers throughout the city, who buy almost daily of complainants some of their products, sometimes sending their own wagons and teams for the merchandise so purchased, and at other times relying on complainants to deliver the same. The trade so built up they have had, until very recently, for a number of years, and is to quite a large extent a cash trade and a valuable one.

" (3) Complainants further aver that in July, 1897, they had in their employ five teamsters, named Michael Walpole, H. McHugh, C. Fox, W. Pfaff, and Edward Hopp. These teamsters had been in the employ of the complainants for some time. Early in July, 1897, the above-named teamsters came to the office of complainants, and requested that they be paid higher wages. Complainants, in answer to such request, asked the said teamsters how much they wanted, to which they replied that they wanted $9 a week for single wagons, and $10.50 for double wagons. Thereupon complainant George Beck asked said Walpole, McHugh, and others, last named, whether they would be satisfied if they were given those wages; whereupon said Walpole replied, in effect, as follows: 'The wages do not cut any figure, but it is the scale we want you to sign.' Said Walpole and others were then told that they could have a reply that same evening, said conversation being in the morning. In the evening of the same day, shortly after 6 o'clock, said Walpole, McHugh, and others came with another person, who they said was the delegate of the Railway Teamsters' Protective Union. They were asked what was meant by the scale which they demanded should be signed, whereupon they produced a written agreement which they had already prepared. A copy of this agreement is hereto attached, and made a part of this bill.

" Complainants not having examined said written agreement called the 'Scale,' it was agreed that the complainants should have a week to examine and consider the same. Subsequently complainants examined the agreement, and on or about the 1st day of August informed the executive committee of the Railway Teamsters' Protective

Union, who seemed to have the matter in charge, and particularly one George Innis, representing said union, that they (the complainants) had decided not to sign the scale, and refused to sign the same. In the meantime complainants' horses had all been sent to their farm in the country, near Plymouth, and all of the trucking and teaming of the business of complainants had been turned over temporarily to the Shedden Cartage Company, Limited, and to Ferguson & Co. At the time said executive committee called, being on or about the 1st of August, complainants informed them of the last-named facts; also that they, the complainants, would bring their teams back from the farm in the fall, and that they would inform them when their teams would be put at work again. About the time that the complainants' teams were sent out into the country, and having no further use then for said teamsters Walpole, McHugh, Fox, Pfaff, and Hopp, they were so notified, and quit working for complainants. In the meantime the said Walpole, McHugh, Fox, Pfaff, and Hopp, as complainants are informed and believe, and so allege, had joined the association called the Railway Teamsters' Protective Union. Some time after they had been discharged, and after they had joined said union, said Walpole, Pfaff, and Hopp came to complainants, and informed them that they had been out of employment ever since they had left the employment of complainants, represented that they were without means to support their families, and that their families were in want; and thereupon complainants, although their teams were still in the country, and having no use for their teamsters, employed said Walpole, Pfaff, and Hopp for work in their mill as extra men. They continued to employ said men in their mill until October 25, 1897. At the time said men returned to the complainants' employ they informed complainants they had withdrawn from the Railway Teamsters' Protective Union.

"(4) Complainants further allege that on Saturday, October 23, 1897, they informed George Innis, a resident of Detroit, who belongs to the Railway Teamsters' Protective Union, and who is the walking or traveling delegate of the Railway Teamsters' Protective Union, that they intended putting on their own teams again on Monday, October 25th, and that the three men who went out and joined their union, namely, Walpole, Pfaff, and Hopp, before mentioned, would on the 25th day of Octo-

ber again start driving for complainants. Complainants so informed Innis simply because they had agreed to so inform him, and as he represented the Railway Teamsters' Protective Union. Complainants further allege that on the morning of the 27th of October said George Innis, with a large number of others, whom said Innis represented belonged to the Railway Teamsters' Protective Union, and were members or members of committees thereof, numbering in all from 15 to 20, appeared in the street in front of the mill of said complainants, on Congress street. Your orators are unable at the time of filing this bill to ascertain the names of all of the parties who accompanied said Innis, but they were informed by said Innis, and also by a number of the other men, that they belonged to the Railway Teamsters' Protective Union, and they were also then informed by said Innis that the purpose of said Innis and his associates there, and the purpose of said Railway Teamsters' Protective Union, was, by threat and by organized effort and by boycotting, to prevent and persuade and compel people from having any business relations or dealings with the said complainants, Jacob Beck & Sons, and to prevent, if possible, any teams of customers from visiting complainants' mill and place of business, and also to prevent any teamsters continuing in or entering the employment of said Jacob Beck & Sons, until said Jacob Beck & Sons had signed the 'Scale' heretofore referred to.

"And your orators allege and charge that said George Innis, as walking or traveling delegate or representative of the Railway Teamsters' Protective Union, and the Railway Teamsters' Protective Union, acting through its representatives and members, and its committees or walking delegates, so called, are unlawfully and wrongfully combining and confederating together to prevent, by intimidation and threats, all persons from patronizing complainants, or buying merchandise from them, or visiting their mill premises for business purposes; and that the said Railway Teamsters' Protective Union, the said George Innis, and his associates and confederates, whose names are at this moment unknown to these complainants, began, and have since constantly pursued, a course of threats and intimidation and persuasion for the purpose, by means of such intimidation and threats and fear, not only to prevent customers from buying of complainants, but also to intimidate and prevent the employés of com-

plainants from continuing in their employ, and from peaceably or otherwise pursuing their work in complainants' mill. And your orators show that the said George Innis, the said Railway Teamsters' Protective Union, and its members, and also the members of the Detroit Council of Trades and Labor Unions, hereinafter mentioned, have intruded into the mill premises and buildings where the men employed by your orators were at work, and have solicited men who were peaceably pursuing their avocations, and who were satisfied to remain in the employment of your orators, and also have threatened and attempted to intimidate them, to quit the employment of your orators, with the purpose and intent, as your orators charge, of preventing your orators from continuing their said business, and thus to force your orators to submit to the terms proposed in said scale; that said solicitation of the employés of your orators, and said intrusion into the places where said men were at work, and into the mill of your orators, constituted an unlawful interference with the business of your orators, and that the persons who have been so soliciting the employés of your orators, and who have been guilty of such intrusion and interference with the business of your orators, are, with few exceptions, unknown to your orators.

"(5) Your orators further allege that, about 11 o'clock on the 27th day of October, John Strigel, who your orators allege is president of the executive board of the Detroit Council of Trades and Labor Unions, and William Campbell, who complainants understand is a patternmaker, and W. Goar, who complainants understand is a machinist, all officers of the Detroit Council of Trades and Labor Unions or of the Railway Teamsters' Protective Union, came to the office of complainants, and after a few minutes' discussion they were told that the complainants would not sign their scale nor their agreement, and would insist upon their right to continue to carry on their work and their business in their own way, so long as the same was done legally, and that they would continue to carry on their work with their own teams and teamsters; that they were paying their teamsters all that said teamsters asked or demanded; that said teamsters were satisfied with their work and with their employment, and were not complaining. Thereupon, and after said complainants had so informed the last-named defendants, to wit, said Strigel, Campbell, and Goar, said

Campbell gave complainants to understand and notified complainants that they, the said Detroit Council of Trades and Labor Unions and the Railway Teamsters' Protective Union, their officers and members, would ruin the business of Jacob Beck & Sons. They further stated that they had already financially ruined a cooper in the city of Detroit, who a few years ago was worth $50,000, and who would not pay or join their union; that they had boycotted him, and they had ruined him by said boycott; and that he had been compelled to mortgage his property. This statement was so made, as complainants allege, for the purpose of intimidating, and by such intimidation compelling complainants to sign what is known as the 'Scale;' and complainants allege that at this time there was no one in their employ, either teamster or laborer, who was asking any raise in their wages, and that, so far as complainants know, all of their employés were satisfied with the terms of their employment, and are still.

"(6) And your orators show that the Railway Teamsters' Protective Union is an organization existing in this State and other States, having in this State, in the city of Detroit, a local subdivision called the Railway Teamsters' Protective Union No. 5,872; that such organizations are voluntary associations, whose proceedings are secret. Your orators allege that the present officers of the Railway Teamsters' Protective Union are as follows: President, William Thoms; secretary, Robert B. Camp; and that George Innis, the person referred to in this bill, is the traveling delegate of said Railway Teamsters' Protective Union.

"Your orators further show that the Detroit Council of Trades and Labor Unions is the Detroit branch of a national association, and that its officers are John Davidson, president; Herbert Greville, vice president; Alex. H. Smith, recording and corresponding secretary; John Strigel, financial secretary; and Jeremiah Sullivan, treasurer; that the proceedings of said Detroit Council of Trades and Labor Unions are, as your orator George Beck is informed, secret. Said association or organization is, through its officers and members, co-operating and combining with and assisting said Railway Teamsters' Protective Union in their efforts, by threats and intimidation, to compel your orators to sign the scale aforesaid, and also to prevent employés not members of said Railway Teamsters' Protective Union to continue in the employment of said

complainants, and also to boycott and interfere with and ruin the business of your orators, by driving away their trade, and by the means aforesaid compelling the public not to deal with or patronize your orators.

"(7) And your orators allege that the persons who have been so congregating and loitering in front of, and in the neighborhood of, complainants' premises, and so soliciting the employés of complainants, and who are so guilty of other threats and acts of intimidation, as herein alleged, and who are guilty of such intrusion and interference of the business of said complainants, are, with few exceptions, unknown to your orators, and are too numerous for your orators to make them parties to this bill of complaint; but your orators aver and show that all of said Railway Teamsters' Protective Union, and all of the members of said Detroit Council of Trades and Labor Unions, in so far as said organizations and practices are unlawful and against the legal rights of your orators, are in combination and are associated together in an unlawful enterprise, and that your orators should not be obliged to make all of said members of said associations who may from time to time be guilty of such interference of the business of your orators parties to this bill of complaint, but that your orators should be permitted to proceed against the representatives of said Railway Teamsters' Protective Union and said Detroit Council of Trades and Labor Unions, to wit, the walking delegates, officers, strike committees, and such other  members of such unions who may be known to your orators, or whose names may be ascertained from time to time, and who are guilty of the unlawful practices herein alleged.  Your orator George Beck states that he has made personal inquiries of said Innis, and in the presence of a large crowd of others who are associated with him for the purpose herein named, to ascertain the names of the other persons whose names are not herein alleged, and that he was refused such information.

"(8) And as showing the purpose of the Detroit Council of Trades and Labor Unions and said Railway Teamsters' Protective Union, said George Innis and others, members or officers of said unions, who are all combining together for the purpose of ruining the complainants' business, they state:  On the evening of October 27, 1897, B. B. Allen, a customer of complainants, sent his team to their mill.  Said team was driven by one Joseph Grindell. The driver stopped his team in front of complainants' mill,

and immediately a large crowd of men, headed by said
Innis, surrounded said Grindell, and endeavored, by
threats and intimidation and persuasion, to induce him to
go away without patronizing the complainants, and with-
out getting what he came to their mill for.   They did in-
duce said Grindell to go to a telephone for the purpose of
informing his employer what the demands of said Innis
and others were, but said Grindell returned to the com-
plainants' mill subsequently, and took his load of oats.
On the same day, to wit, October 27th, said George Innis
informed Roundsman Walpole that up to that hour, 5
o'clock, he, the said Innis, had stopped 15 teams from
going into the place of business of Jacob Beck & Sons, all
of which said teams complainants allege were going there
for the purpose of making purchases and doing business
with complainants; and complainants further allege that
heretofore their local cash daily sales have been about
$100; that on the 26th day of October they were $99.04;
and that on the 27th day of October, the day when said
Innis claimed that he and his associates, confederating
and conspiring and combining together to ruin complain-
ants' business, had stopped the 15 teams, such transient
sales were only $33.44, showing a ‘ large loss to com-
plainants, arising solely, as complainants allege, through
the conduct of said Innis, said Railway Teamsters' Pro-
tective Union, and the Detroit Council of Trades and
Labor Unions, and the followers of said Innis, and mem-
bers and officers of said organizations.

''(9) Complainants further allege that about 3:30 on
the 28th of October, 1897, one Alex. McIsaac, doing busi-
ness at 1146 Grand River avenue, called at complainants'
mill for feed, being a regular customer of complainants,
and that said McIsaac was stopped in front of the entrance
to the mill by said Innis and his followers, said Innis being
apparently the ringleader, and was strongly urged ‘ and
persuaded not to buy any goods from Jacob Beck ‘& Sons;
that, in addition to persuasion, said Innis and his followers
used threatening words, and used threats, and almost
violence, and that such language used was so strong that
Roundsman Walpole, who was present to protect com-
plainants' property, ordered the crowd to leave the man
and team alone, and in this way only was said McIsaac
free to patronize said complainants.   And your orators
further charge, on information and belief, that the above
are not the only instances where said Innis and his associ-

ates have attempted, by threats of boycott and intimidation, to drive away the customers of your orators, but that said Innis and his associates have visited a large number of customers of complainants for this purpose, and have threatened them with boycott, and with injury to their business, in case they continued to trade with said complainants, and have distributed to them boycott circulars similar to those herein set forth.

"(10) And your orators further show that on the 28th day of October, 1897, and also on the 29th day of October, there appeared in front of complainants' mill said Innis and divers and sundry other persons, members of said union, at least 15 in number, who are their associates and confederates, and from early morning until late at night constantly hung and loitered about complainants' mill, at the place aforesaid, and upon the streets in close proximity, for the purpose of picketing the premises of complainants, and for the purpose of preventing complainants' customers from entering complainants' premises, and that one of the means of doing this was by the distribution of a boycott circular. One of said circulars is hereto attached. Circulars similar to the one attached were distributed by said Innis and his confederates and associates, representing themselves to complainants to be members of the Detroit Council of Trades and Labor Unions and the Railway Teamsters' Protective Union, to almost every team or person who entered or passed the mill of complainants, and to customers of complainants. Complainant George Beck personally saw a large number of these circulars distributed to customers of his firm; and complainants allege that when these circulars were delivered to their customers, many of whom were grocers and feed dealers in different parts of the city, they were accompanied by a threat from said Innis and his associates, confederating together, that, if the customer continued to trade with Jacob Beck & Sons, his, the customer's, trade would be ruined. And complainants allege that the distribution of these boycott circulars was continued on the 29th of October, and is being continued, by said Railway Teamsters' Protective Union, Detroit Council of Trades and Labor Unions, and their officers and members, and George Innis, and others before mentioned, and that the distribution of these boycott circulars is calculated to and will injure or ruin the business of the complainants, and that they are being distributed for this

purpose, and as one of the means of carrying out the threat made by said Innis and his associates that they would ruin the complainants' business before they had finished with them.

"And complainants allege, in reference to the statements made in said circular, that they have never entered into an agreement with the Railway Teamsters' Protective Union or the Detroit Council of Trades and Labor Unions in July, 1897, that they would employ none but union men thereafter, and complainants deny that they have discharged any union men and hired nonunion men in their places, but, on the contrary, state that the teamsters who left their employ and joined the union were not discharged because they were union men, but subsequently left said Railway Teamsters' Protective Union, as complainants are informed, and returned to work for complainants, and said Walpole, Pfaff, and Hopp are now working for complainants.

"(11) Your orators further charge that the said Detroit Council of Trades and Labor Unions, and the said Railway Teamsters' Protective Union, said George Innis, and the officers, committees, and walking delegates of said organizations, have and are still willfully and maliciously combining together in intimidating and threatening persons in the employ of the complainants from remaining in their employ, and that they have threatened several of complainants' employés, particularly said Pfaff, with personal violence if he continued to remain in complainants' employ; and they allege and charge that the Detroit Council of Trades and Labor Unions, and said Railway Teamsters' Protective Union, George Innis, John Strigel, William Campbell, William Goar, John Dernberger, James Cochrane, Frank Ladd, William Singleton, Herbert Sheldon, George Wilson, Sanford S. Diamond, J. W. Morris, and Charles Fox, their agents, servants, confederates, and the committees, members, officers, and walking delegates of said Detroit Council of Trades and Labor Unions and Railway Teamsters' Protective Union, have conspired and combined, and are conspiring and combining, to boycott complainants and their business by means of the circular aforesaid, by intimidation of customers, by visiting customers of complainants at their places of business, and threatening them with boycott in case they continued to trade with complainants, by gathering in threatening crowds in front of and in the neighborhood of com-

plainants' place of business, by threatening with violence
employés of complainants, by the distribution of circulars,
etc., and generally injuring complainants in their said
business, and preventing them from carrying on the same,
and that their acts in the premises have required the
attendance of several policemen constantly for the last
three or four days in order to prevent violence, and to
enable complainants in any manner to use their wagons
and carry on their business; and they allege and charge
that said parties last named and said members of said as-
sociations, if allowed to continue the acts which they are
now committing, or allowed to gather in threatening
crowds in front of complainants' mill, or allowed to inter-
fere, as they have, with complainants' customers and em-
ployés, that the business carried on by the complainants,
which is a large one, and the good will of which is of
large value, will be seriously injured, if not ruined.

"(12) And complainants allege that they are entirely
without remedy at law, and can only be fully protected
and relieved in a court of equity."

The prayer of the bill is that defendants be enjoined:

"(1) From in any manner interfering with the employés
of the complainants now in the employ of your orators,
and from in any manner interfering with any person who
may desire to enter the employ of your orators, by the
way of threats, personal violence, intimidation, or other
means calculated or intended to prevent such persons from
entering or continuing in the employment of your orators,
or calculated or intended to induce any such person or
persons to leave the employment of your orators.

"(2) From boycotting your orators, either by the dis-
tribution of circulars or handbills or otherwise.

"(3) From interfering, intimidating, boycotting, mo-
lesting, or threatening in any manner the customers of
your orators, or any other person or persons, with the
purpose of inducing such person or persons not to deal
with or do business with your orators.

"(4) From congregating or loitering about or in the
neighborhood of the premises of your orators, or at other
places, with intent to interfere with the employés of your
orators, or with the prosecution of their work, or to inter-
fere with or intimidate the employés of your orators with
intent to cause them to leave the employment of your
orators, or to interfere with or obstruct in any manner the

business or trade of your orators, and to prevent or induce the public not to trade with or deal with your orators.

"(5) From interfering with the free access of employés of your orators to your orators' premises, and their places of work, and the free return of said employés to their places of business or their homes.

"(6) From impeding, obstructing, or interfering with, by boycott, threat, or otherwise, the trade or customers of your orators, with the purpose of inducing them not to patronize or deal with your orators.

"(7) From giving any directions or orders to committees, associations, or otherwise for the performance of any such acts or threats hereinbefore enjoined, and from in any manner whatsoever impeding, obstructing, or interfering with the regular operation and conduct of the business of your orators.

"(8) And for such other and further relief as shall be deemed equitable."

That part of the scale or contract presented to the complainants by the union, essential to note, is as follows:

"Any difference that may arise between you and ourselves that cannot be settled by the delegate or committee, except the question of wages (provided for above), to be submitted to a board of arbitration, which board is to consist of three members, one of whom shall be selected by you, another by ourselves, and the third by the two arbitrators selected as above provided. A man laid off for any cause shall receive prompt investigation, and, if found to have been in fault, may be discharged, or taken back at loss of pay, as you may determine; but, if found not to have been in fault, he shall receive pay for the time laid off. Each new man entering your employ shall be paid union wages, and shall be provided with a working card by the union; and each such new man, if found capable by you and satisfactory to the union, shall become a member thereof, at the second regular meeting from the time of his entering your employ. But, if he is found not to be a capable man, you shall notify the delegate or committee within thirty (30) days, counting from the first day of his entering your employ. But in no case shall a nonunion man be employed while a capable union man is unemployed. And *provided, further*, that the union reserves the right to reject any man not complying with its rules and regulations, and after such rejection you shall

not continue him in your employ, after having been duly notified of such rejection by delegate or committee of said union.   Any man selected by said union to act as delegate or on committee shall retain the same place as previously held by him in your employ, after his term of delegate or on committee has expired.   Should a slack time occur, and you have not sufficient work for all the men in your employ, and for that reason you find it necessary to reduce your expenses by laying off some of the men, *the men last employed shall in all cases be the first laid off*.   The above clause subject to our mutual agreement made on the attached list.   If the freight departments and business houses close at an earlier hour on Saturdays than on other days, and the men are sent to the barn, they shall not, on account of the earlier closing on that day, receive less than a full day's pay.   *   *   *   It is also agreed that Jacob Beck & Sons are to have the privilege of employing one single teamster on the light, quick-delivery wagon at the rate of $8.00 per week; if employed on any other truck, he shall receive the regular scale:   *Provided, further*, that no other man can be found at the time to be put on."

The boycotting circular is as follows:

"BOYCOTT
"JACOB BECK & SON'S FEED MILLS.
"To Organized Labor and Their Friends:
"The above firm has broken faith with the representatives of the Trades Council and the Railway Teamsters' Union, by annulling an agreement entered into with the above organizations in July last, that none but union men should be employed by that firm thereafter.

"They have now discharged their union men, and hired nonunion men to take their places.   We therefore ask all people who believe in living wages and fair treatment of employés to leave this firm and their product severely alone.

"BOYCOTT BECK & SON.
"By order of DETROIT TRADES COUNCIL."

The Council of Trades and Labor Unions, the Teamsters' Union, and Walking Delegate Innis each filed a separate answer.   It is unnecessary to state these answers in full.   They all deny the use of intimidation and threats as alleged in the bill of complaint.   The answer of the council alleges that, at the request of the Teamsters'

Union, they called upon complainants, and attempted to settle the dispute; that they did not succeed; and that thereupon they indorsed the boycott established by the Teamsters' Union.

The answer of the Teamsters' Union alleges that—

"They insist that they have a perfect legal right to advise dealers and consumers not to use goods sold and manufactured by nonunion firms, and as union men they have a perfect right to refuse to trade with retail dealers who deal in goods commonly known as 'scab goods,' which they admit they did do."

The second paragraph of defendant Innis' answer is as follows:

"This defendant further avers that he did not at any time appear at or near the premises of said complainants with other members of the said union for the purpose of threatening, by organized effort, to compel any person or persons not to have any business relations with the said complainants, or to threaten and compel any teamster not to continue in or enter the employment of said complainants, until said complainants had signed the scale, as is alleged by said complainants in paragraph 4 of their bill of complaint, but that he did appear there with other members of said union upon the public street, and not upon the premises of said complainants, for the purpose of explaining to people passing and repassing from said complainants' place of business the treatment said union had received from said complainants, and to then and there leave the matter to the best judgment of the said people as to what they should do in relation to dealing with said complainants."

They all assert that their acts were legal and proper.

Upon the filing of the bill a preliminary injunction was issued. Issue was duly joined, and proofs taken in open court. A large amount of testimony was introduced by the complainants, but none on the part of the defendants. The court entered the following decree:

"This cause having come on to be heard upon the bill of complaint herein, answers thereto, the replication of the complainants to such answers, and the proofs taken in

such cause in open court, and having been argued by the counsel for the respective parties, and the court having duly considered the same, it is ordered, adjudged, and decreed as follows: That each and all of the said defendants in this cause be, and are hereby, permanently enjoined, and each and all of said defendants are hereby ordered from this day to absolutely desist and refrain from:

"(1) In any manner interfering with the employés of the complainants, Jacob Beck, George Beck, and Jacob F. Beck, copartners as Jacob Beck & Sons, now in the employ of said Jacob Beck & Sons, and from in any manner interfering with any person who may desire to enter the employ of said Jacob Beck & Sons, by way of threats, personal violence, intimidation, or other unlawful means calculated or intended to prevent such persons from entering or continuing in the employ of said Jacob Beck & Sons, or calculated or intended to induce any such person or persons to leave the employ of said Jacob Beck & Sons.

"(2) From interfering, intimidating, boycotting by violence, molesting, or threatening in any manner the customers of said complainants, Jacob Beck & Sons, or any other person or persons, for the purpose, by means of such interference, intimidation, boycott, or threats, of inducing such person or persons not to deal with or do business with said Jacob Beck & Sons.

"(3) From congregating or loitering about or in the neighborhood of the premises of complainants, Jacob Beck & Sons, or at other places, with intent to interfere with the employés of said complainants, Jacob Beck & Sons, or with the prosecution of their work, and to interfere with or intimidate the employés of said complainants with intent to cause them to leave the employment of complainants, or to interfere with or obstruct in any manner the business or trade of said Jacob Beck & Sons, and to prevent or induce the public, by means of boycott circulars or threats of boycott, or by threats of injuring the business of any person or persons, not to trade or deal with the said Jacob Beck & Sons.

"(4) From interfering with the free access of employés of Jacob Beck & Sons to Jacob Beck & Sons' premises, and their place of work, and the return of said employés to their places of business or their homes.

"(5) From impeding, obstructing, or interfering with, by boycott, violence, threat, intimidation, or otherwise,

the trade or customers of said Jacob Beck & Sons, with the purpose or intention of inducing them not to patronize the said complainants.

" (6) From giving any directions or orders to committees, associations, or otherwise for the performance of any such acts or threats hereinbefore enjoined, and from in any manner whatever impeding, obstructing, or interfering with the regular operation and conduct of the business of complainants.

" (7) It is further ordered, adjudged, and decreed that nothing hereinbefore contained shall be construed as inhibiting the peaceable distribution of circulars such as is attached to the bill of complaint in this cause, or circulars similar thereto, to customers of said Beck & Sons, or to the public, in the vicinity, but not in front, of the mill or premises of said complainants, Jacob Beck & Sons, or inhibiting any peaceful appeal to refrain from their business relations with said Beck & Sons.

"(8) And it is further ordered, adjudged, and decreed that said injunction shall not be construed as inhibiting said defendants from threatening to boycott, except by violence, or from boycotting by peaceful means, or from the distribution of said boycott circulars, such as is attached to the bill of complaint in this cause, or circulars similiar thereto, to said customers or to the public, or from threatening to injure, affect, or ruin the business of said customers of said Jacob Beck & Sons, or others, by any effort to compel or induce said customers or others to refrain from business relations with said Beck & Sons, which effort shall not be accompanied with violence or threat of violence."

*Bowen, Douglas & Whiting,* for complainants.

*Peter E. Park* and *T. E. Tarsney,* for defendants.

GRANT, C. J. ( *after stating the facts* ).    The allegations of the bill are fully sustained by the evidence.    When complainants' teamsters presented the contract to them in July, they informed complainants that it was not so much the wages, but it was "the scale they wanted them to sign."    The teamsters did not have the contract with them, and again called in the evening, with the defendant

Innis. The contract being a long one, complainants took time to consider it; and when Innis and the teamsters called, a few days afterwards, complainants declined to sign it, and informed Innis and the teamsters that they had made arrangements with the Shedden Truck Company and others to do their trucking during the summer. The Shedden Truck Company employed only union men. Complainants also employed one Richardson, who owned a team, and was not a member of the union, to do some teaming. The union teamsters immediately began obstructing Mr. Richardson in his work, by getting in his way, and howling at him; and, when Mr. George Beck came up on his bicycle, some one in the crowd cried out: "Here is a rope. Hang Beck with that. That is the fellow you want." Some sticks and bricks were also thrown. A policeman was called, and then the union teamsters gave Mr. Richardson the right of way. Meanwhile crowds collected in a threatening manner around the mill to watch those going to purchase and to endeavor to stop them. Two policemen were called in to preserve order. This state of affairs continued for about a week, during which time customers were intimidated and frightened away, and the Shedden Truck Company forced to refuse to do trucking for complainants. The boycotting circular was issued, and it was distributed to complainants' customers and others by the representatives of the union, in the streets and elsewhere.

On August 7th the executive committee from the Council of Trades and Labor Unions, accompanied by Mr. Innis, visited complainants, and endeavored to persuade them to sign the agreement. Union teamsters to the number of 10 or 15 were then outside in the street, making considerable noise. Complainants refused to sign the scale, and informed their visitors that they had employed the Shedden Truck Company to do their trucking for the summer, and that when they brought their teams back in the fall they would notify the union. This pacified the union, though the result was to throw the five teamsters

then belonging to the union and employed by complainants out of employment. In October complainants brought back their teams, and notified Innis of the fact, and that they should employ their own teamsters, and would not sign the contract. Then the Teamsters' Union, defendant Innis, and others, evidently with the approval of the Trades Council, began the systematic course of conduct complained of. Meanwhile complainants' teamsters, without their advice or knowledge, had withdrawn from the union. Members of the union followed complainants' teamsters along the streets, howling at them, and using aggressive, abusive, and filthy language. They followed them to their destination, and there threatened to boycott the customers of Beck & Sons. They intercepted upon the streets those who were going to the mill with their teams. Defendant Innis boasted that he had turned 15 customers away in one day. Violence was threatened by Delegate Innis and others. Some of them even went into the barn of the complainants, and endeavored, by abusive and threatening language, to drive the teamsters away from their work. Their conduct and threats were in some instances accompanied by language too filthy to print. These facts are unchallenged, the defendants introducing no testimony to deny them or to impeach the character of the witnesses. In this condition of affairs, complainants filed this bill to enjoin these illegal acts, and to save their business from destruction, and themselves from financial ruin.

The defendants have not appealed from the decree against them. No attempt is made by their counsel to defend or justify their action, or to deny the many acts of intimidation, threats, and almost violence; and the learned circuit judge in his opinion said: "I am satisfied these things have been done, and that defendants have combined together for this purpose. I do not intend to justify the publication." Their counsel frankly concede that "it was unlawful for defendants to enter upon the premises of the complainants, or to gather in groups in the street in

front of complainants' premises, or to use any force or violence for the accomplishment of their purpose." In other words, they concede that defendants were engaged in an "unlawful conspiracy," as defined by Shaw, C. J., in *Com.* v. *Hunt,* 4 Metc. (Mass.) 111, 121 (38 Am. Dec. 346), a definition approved by the Supreme Court of the United States in *Callan* v. *Wilson,* 127 U. S. 540, 555, viz. :

"The general rule of the common law is that it is a criminal and indictable offense for two or more to confederate and combine together, by concerted means, to do that which is unlawful or criminal, to the injury of the public, or portions or classes of the community, or even to the rights of an individual."

The decree sanctioned the distribution of the boycott circulars to customers and the public generally, except in front of the mill premises, and any form of boycott, either to complainants or to their customers, without the actual use of violence, and sanctioned threats to injure, affect, and ruin complainants' business, when unaccompanied by violence or threat of violence. From this part of the decree complainants have appealed.

It is conceded that courts of equity have jurisdiction to restrain conspiracies of this character when irreparable injury is sure to follow. Suits at law would be inadequate, and a multiplicity of suits at law would arise. Complainants were engaged in a lawful business, and carrying it on in a lawful manner. They had done nothing to the defendants, or any of them, either illegal, immoral, or unjust. They were paying wages to their teamsters in fact greater than the union teamsters received, because they made no deductions for certain lost time which the union employers made. The law protects them in the right to employ whom they please, at prices they and their employés can agree upon, and to discharge them at the expiration of their term of service or for violation of their contracts. This right must be maintained, or personal liberty is a sham. So, also, the laborers have

the right to fix a price upon their labor, and to refuse to work unless that price is obtained.   Singly, or in combination, they have this right.   They may organize in order to improve their condition and secure better wages.   They may use persuasion to induce men to join their organization, or to refuse to work except for an established wage. They may present their cause to the public in newspapers or circulars, in a peaceable way, and with no attempt at coercion.   If the effect in such case is ruin to the employer, it is *damnum absque injuria,* for they have only exercised their legal rights.   The law does not permit either party to use force, violence, threats of force or violence, intimidation, or coercion.   The right to trade and the personal liberty of the employer alone are not involved in this case; the right of the laborer to sell his labor when, to whom, and for what price he chooses is involved.

The five teamsters of the complainants were satisfied with their wages and their treatment.   By the action of the defendants, they were thrown out of employment during the summer, except as complainants employed them, when they could, at other work about their mill.   The union would not permit Mr. Pfaff to use a horse and wagon which complainants tendered him free of expense, in order that he might provide for himself and family.   A boycott of labor as well as of capital is therefore involved in this controversy.   The acts and conduct of these defendants are not those of freedom, but of tyranny.

Let us look at the correlative of what these defendants did.   If employés have the right to combine to fix their wage rate,—and this is conceded,—employers have the like right to combine to fix a rate they are willing to pay. The law is the same for both, and is alike open to both. If the employers of Detroit had combined in secret organization, established a rate, and agreed to boycott, in the manner these defendants boycotted complainants, any employer and his laborers who would pay more than the price the combination had agreed to, and had carried the

conspiracy out as was done here, would these defendants consider that just and lawful conduct? Neither courts of equity nor of law would turn such employer and employés away from its temple of justice without a remedy.

It requires no argument to show that in this case, both in reason and authority, actions at law would be utterly inadequate. The course pursued by these defendants, if unchecked, would soon ruin the complainants' business, and bring upon them financial ruin. The defendants and their associates well knew this, and undoubtedly hoped to force complainants to abdicate their legal rights, and to permit defendants to dictate whom complainants should employ, the price they should pay, and the reasons for discharging their employés. While some writers have doubted the remedy by injunction, it is now settled beyond dispute. *Thomas* v. *Railway Co.*, 62 Fed. 803; *Springhead Spinning Co.* v. *Riley*, L. R. 6 Eq. Cas. 551; *Vegelahn* v. *Guntner*, 167 Mass. 92 (35 L. R. A. 722, 57 Am. St. Rep. 443); *Davis* v. *Zimmerman*, 91 Hun, 489; *Gilbert* v. *Mickle*, 4 Sandf. Ch. 357; *U. S.* v. *Elliott*, 64 Fed. 27; *Hopkins* v. *Oxley Stave Co.*, 28 C. C. A. 99, 83 Fed. 912; *Toledo, etc., R. Co.* v. *Pennsylvania Co.*, 54 Fed. 730 (19 L. R. A. 387); *Sherry* v. *Perkins*, 147 Mass. 212 (9 Am. St. Rep. 689); *Hamilton-Brown Shoe Co.* v. *Saxey*, 131 Mo. 212 (52 Am. St. Rep. 622); *Arthur* v. *Oakes*, 11 C. C. A. 209, 63 Fed. 310 (25 L. R. A. 414). Many more authorities might be cited.

There is a long list of civil and criminal authorities which might also be cited holding such combinations unlawful. Among them are the following: *State* v. *Donaldson*, 32 N. J. Law, 151 (90 Am. Dec. 649); *State* v. *Glidden*, 55 Conn. 46 (3 Am. St. Rep. 23); *Reg.* v. *Bunn*, 12 Cox, Cr. Cas. 316; *Rex* v. *Ferguson*, 2 Starkie, 489; *People* v. *Fisher*, 14 Wend. 9 (28 Am. Dec. 501); *People* v. *Kostka*, 4 N. Y. Cr. R. 429; *Walker* v. *Cronin*, 107 Mass. 555; *Carew* v. *Rutherford*, 106 Mass. 1 (8 Am. Rep. 287); *People* v. *Melvin*, 2 Wheeler, Cr. Cas. 262; *Crump* v. *Com.*, 84 Va. 927 (10 Am. St. Rep. 895);

*State* v. *Stewart*, 59 Vt. 273 (59 Am. Rep. 710); *Callan* v. *Wilson*, 127 U. S. 540.   For instances of lawful combinations, see *Com.* v. *Hunt*, 4 Metc. (Mass.) 111 (38 Am. Dec. 346); *Master Stevedores' Association* v. *Walsh*, 2 Daly, 1; *Wood* v. *Bowron*, 10 Cox, Cr. Cas. 344; *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. Div. 598; *Allen* v. *Flood*, 23 App. Cas. 1; *Brewster* v. *Miller*, (Ky.) 41 S. W. 301; *Macauley* v. *Tierney*, 19 R. I. 255 (37 L. R. A. 455, 61 Am. St. Rep. 770); *Clemmitt* v. *Watson*, 14 Ind. App. 38.

The law abhors subterfuges.   It lays aside the covering, and looks to the actual facts beneath.   In the language of Chief Justice Shaw:

"The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality, through whatever disguise it may assume."   *Com.* v. *Hunt*, 4 Metc. (Mass.) 111, 129 (38 Am. Dec. 346).

Threats in language are not the only threats recognized by the law.   Covert and unspoken threats may be just as effective as spoken threats.   So, where banners were displayed in front of one's premises bearing the following inscription: "Lasters are requested to keep away from P. P. Sherry's.   Per order L. P. U.,"—it was held unlawful, and the act restrained by injunction.   *Sherry* v. *Perkins*, 147 Mass. 212 (9 Am. St. Rep. 689).   The court said: "The banner was a standing menace to all who were, or wished to be, in the employment of the plaintiffs, to deter them from entering the plaintiffs' premises."   The court held that the display of the banners was part of the scheme unlawfully entered into.

So, when these defendants went, in numbers of from 5 to 25, along the streets, and into the business houses of complainants' customers, distributing these circulars, which contained false statements, as hereinafter shown, and which commenced and closed with the words, "Boycott Jacob Beck & Sons," they intended, in emphatic manner, to convey to the customers of complainants that they would be treated in like manner unless they ceased to trade

with complainants. The distance that this was done from the mill of the complainants does not detract from its character or harmfulness. It was just as effective and as wrong when done 1,000 feet from the mill as when done 10 feet from it. The act itself, not the distance, determines its character. The circular was false in stating that complainants had violated their agreement or had discharged their union men. They had done neither. It was also false in conveying the impression that complainants were not paying living wages or giving their employés fair treatment. The use of this false circular was one of the potent means to carry out the conspiracy. The defendants by their conduct gave every laborer and customer of complainants their definition of what they understood the term "boycott" to mean. It would be idle to argue that these circulars were not intended as a menace, intimidation, and coercion. They were so used, and were "a standing menace" to every one who wished to work for, or trade with, complainants. They constituted a part of the unlawful scheme, and their circulation should have been enjoined.

To picket complainants' premises in order to intercept their teamsters or persons going there to trade is unlawful. It itself is an act of intimidation, and an unwarrantable interference with the right of free trade. The highways and public streets must be free to all for the purposes of trade, commerce, and labor. The law protects the buyer, the seller, the merchant, the manufacturer, and the laborer in the right to walk the streets unmolested. It is no respecter of persons; and it makes no difference, in effect, whether the picketing is done 10 or 1,000 feet away.

It will not do to say that these pickets are thrown out for the purpose of peaceable argument and persuasion. They are intended to intimidate and coerce. As applied to cases of this character, the lexicographers thus define the word "picket": "A body of men belonging to a trades union sent to watch and annoy men working in a

shop not belonging to the union, or against which a strike is in progress." Cent. Dict.; Webst. Dict. The word originally had no such meaning. This definition is the result of what has been done under it, and the common application that has been made of it. This is the definition the defendants put upon it in the present case. Possibly the decree is specific enough to include picketing, but we deem it our duty to place it beyond controversy.

The decree permits "boycotting by peaceful means," and the ruin of complainants' business by threats or any means short of violence. If, as some authorities hold, the term "boycott" has no authoritative meaning, then the decree is indefinite, and the defendants have no guide except that they must refrain from actual violence or threats of violence. The authorities do not sustain this proposition. If these defendants had threatened complainants' teamsters that, unless they ceased to work for them and joined the union, they had the power, and would use it, to induce all merchants not to sell them any goods by which they might support themselves and families, and had carried out this threat by issuing boycotting circulars, and notifying merchants personally, by their committees, that they must cease to sell goods to these men, there would have been no act or threat of violence. But would the boycott or conspiracy have been lawful? May these powerful organizations thus trample with impunity upon the right of every citizen to buy and sell his goods or labor as he chooses? This is not a question of competition, but rather an attempt to stifle competition. It is a question of the right to exist. If there be no redress from such wrongs, then the government is impotent indeed. But such a combination is a criminal conspiracy at the common law, and in some States, in order to remove all doubt, is made so by statute.

In *State* v. *Glidden*, *supra*, no act or threat of violence was charged in the indictment or proved upon the trial. The charge was that,—

"If the corporation did not yield to their demands, the defendants and their associates would in like manner

represent to and threaten all persons dealing with the corporation; and that they could and would so control, boycott, and injure the business customers of such persons, as through fear, and by the to-be threatened and concerted withdrawal of the patronage of the defendants, and by stopping and preventing the patronage of others through threats and intimidations, and by other unlawful means, to compel such customers, though against their will, to cease doing business with the subscribers and others, patrons of the corporation; and that the defendants would not give up or abandon these proceedings to injure the business of the corporation until they had either destroyed said business, and prevented it from being carried on, or until the corporation should comply with their demands."

That case and this are substantially alike. In order to induce complainants to yield, the committee of the Trades Council informed them that they had substantially ruined one man. The decision of the court was unanimous, and in it is the following language:

"If we look at this transaction as it appears on the face of this information, we shall be satisfied that the defendants' purpose was to deprive the Carrington Publishing Company of its liberty to carry on its business in its own way, although in doing so it interfered with no right of the defendants. The motive was a selfish one,—to gain an advantage unjustly, and at the expense of others,— and therefore the act was legally corrupt. As a means of accomplishing the purpose, the parties intended to harm the Carrington Publishing Company, and therefore it was malicious. It seems strange that in this day, and in this free country,—a country in which law interferes so little with the liberty of the individual,—it should be necessary to announce from the bench that every man may carry on his business as he pleases, and may do what he will with his own, so long as he does nothing unlawful, and acts with due regard to the rights of others; and that the occasion for such an announcement should be, not an attempt by government to interfere with the rights of the citizen, nor by the rich and powerful to oppress the poor, but an attempt by a large body of workingmen to control, by means little, if any, better than force, the action of employers. The defendants and their associates said to

the Carrington Publishing Company: 'You shall discharge the men you have in your employ, and you shall hereafter employ only such men as we shall name.   It is true we have no interest in your business, we have no capital invested therein, we are in no wise responsible for its losses or failures, we are not directly benefited by its success, and we do not participate in its profits; yet we have a right to control its management, and compel you to submit to our dictation.'   The bare assertion of such a right is startling.   The two alleged rights cannot possibly co-exist.   One or the other must yield.

"If the defendants have the right which they claim, then all business enterprises are alike subject to their dictation.   No one is safe in engaging in business, for no one knows whether his business affairs are to be directed by intelligence or ignorance,—whether law and justice will protect the business, or brute force, regardless of law, will control it; for it must be remembered that the exercise of the power, if conceded, will by no means be confined to the matter of employing help.   Upon the same principle, and for the same reasons, the right to determine what business others shall engage in, when and where it shall be carried on, etc., will be demanded, and must be conceded.   The principle, if it once obtains a foothold, is aggressive, and is not easily checked.   It thrives on what it feeds on, and is insatiate in its demands.   More requires more.   If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it.   All history proves that abuses and excesses are inevitable.   The exercise of irresponsible power by men, like the taste of human blood by tigers, creates an unappeasible appetite for more.

"Business men have a general understanding of their rights under the law, and have some degree of confidence that the government, through its courts, will be able to protect those rights.   This confidence is the cornerstone of all business.   But if their rights are such only as a secret and irresponsible organization is willing to concede to them, and will receive only such protection as such an organization is willing to give, where is that confidence which is essential to the prosperity of the country?"

The true principle is thus stated:

"It is in the line of competition, and every way just,

for a laborer to seek an enhancement of his wages, and for an employer to desire to depress them. The end is lawful, and especially in the laborer it is commendable. But when the means devised for this just end is the destruction of competition by men combining to shut others out from the benefits which they claim for themselves, or to violate their agreements, or to commit assault and battery and other breaches of the peace, or to wield the power of numbers for the impoverishment of those who refuse to join or co-operate with them, or to move suddenly and together in a manner to injure the public, or even one person, the conspiracy is a public harm, calling loudly for punishment." 2 Bish. New Cr. Law, § 230, par. 2.

In *Springhead Spinning Co.* v. *Riley, supra,* the publication of placards and advertisements, which was part of a scheme to prevent persons from working, and which did intimidate and prevent them, was, upon demurrer to the bill, enjoined, though no violence was threatened. The vice chancellor said:

"Upon the general question whether this court can interfere to prevent these unlawful proceedings by workmen issuing placards amounting to intimidation, and whether acts of intimidation generally would go to the destruction of property, that will probably have ultimately to be decided at the hearing of this cause. In the meantime I would only make this observation: That by the act of parliament it is recited that all such proceedings are injurious to trade and commerce, and dangerous to the security and personal freedom of individual workmen, as well as the security of the property and persons of the public at large; and if it should turn out that this court has jurisdiction to prevent these misguided and misled workmen from committing these acts of intimidation, which go to the destruction of that property which is the source of their own support and comfort in life, I can only say that it will be one of the most beneficial jurisdictions that this court ever exercised."

In *Casey* v. *Typographical Union,* 45 Fed. 135 (12 L. R. A. 195), the attempt was to compel complainant to unionize his establishment. No violence or threats of violence were used. Otherwise the case is the parallel of this. The court say of it, at page 143:

"It was an organized conspiracy to force the complainant to yield his right to select his own workmen, and submit himself to the control of the union, and allow it to regulate prices for him, and to determine whom he should employ and whom discharge. In other words, it was and is an organized effort to force printers to come into the union, or be driven from their calling for want of employment, and to make the destruction of the complainant's business the penalty for his refusing to surrender to the union. Whatever moral obligation may have been incurred by complainant by reason of his promises to unionize his office, they were wholly without consideration, and they amount to nothing whatever, in law or in equity. No case has been cited where, upon a proper showing of facts, an unsuccessful appeal has been made to a court of chancery to restrain a boycott. The authorities are all the other way. At common law an agreement to control the will of employers by improper molestation was an illegal conspiracy."

Similar language will be found in other of the cases above cited and in others not cited.

The term "boycott" has been defined by lexicographers and courts. Cent. Dict.; *State* v. *Shelton*, 22 Va. Law J. 329; *Brace* v. *Evans*, 3 Ry. & Corp. Law J. 561; *Toledo, etc., R. Co.* v. *Pennsylvania Co.*, 54 Fed. 738 (19 L. R. A. 387). In *Brace* v. *Evans, supra*, the court say: "The word 'boycott' in itself implies a threat." In *Toledo, etc., R. Co.* v. *Pennsylvania Co.*, it is said:

"The word 'boycott' is usually understood as a combination of many to cause a loss to one person by coercing others, against their will, to withhold from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them."

Undoubtedly, this is the common understanding of its meaning.

The law sanctions only peaceful means, which leave every one to the exercise of his own free will. The boycott, condemned by the law, is not alone that accompanied by violence and threats of violence, but that where the means used are threatening in their nature, and intended and

naturally tend to overcome, by fear of loss of property, the will of others, and compel them to do things which they would not otherwise do. Erle, C. J., speaking of the laborer's rights, says:

"Every person has a right under the law, as between himself and his fellow subjects, to full freedom in disposing of his own labor or his own capital, according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others." Erle, Trades Unions, 12; *Allen* v. *Flood*, 23 App. Cas. 1, 75.

There is nothing upon the record to show, nor is it claimed, that the defendants the Teamsters' Union and the Trades Council are unlawful combinations or organizations. The right of such organizations to exist has always been recognized. Chief Justice Shaw, in 1842, in *Com.* v. *Hunt, supra,* recognized them as lawful, and uses this illustration:

"Suppose a class of workmen, impressed with the manifold evils of intemperance, should agree with each other not to work in a shop in which ardent spirit was furnished, or not to work in a shop with any one who used it, or not to work for an employer who should, after notice, employ a journeyman who habitually used it; the consequences might be the same. A workman who should still persist in the use of ardent spirit would find it more difficult to get employment; a master employing such an one might, at times, experience inconvenience in his work, in losing the services of a skillful, but intemperate, workman. Still it seems to us that as the object would be lawful, and the means not unlawful, such an agreement could not be pronounced a criminal conspiracy."

It is urged that courts of equity will not restrain the publication of a libel, and that this boycotting circular is a libel, the publication and circulation of which cannot be enjoined. The same claim was made that courts of equity have no jurisdiction to restrain the commission of a crime. But the answer is, and always has been, that parties can-

not interpose this defense when the acts are accompanied by threats, express or covert, or intimidation and coercion, and the accomplishment of the purpose will result in irreparable injury to, and the destruction of, property rights. If all there was to this transaction was the publication of a libelous article, the position would be sound. It is only libelous in so far as it is false. Its purpose was not alone to libel complainants' business, but to use it for the purpose of intimidating and preventing the public from trading with the complainants. It called upon them to boycott them. The defendants, by their conduct, gave all the patrons of complainants, and others as well, the meaning they attached to the word "boycott," and they all evidently understood it as the defendants interpreted it by their conduct and acts. It is true that, under our Constitution, no one can be enjoined from publishing a libel. (Const. Mich. art. 4, § 42.) By this provision, every person is entitled to "freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of such right." See *Hamilton-Brown Shoe Co.* v. *Saxey*, 131 Mo. 221 (52 Am. St. Rep. 622).

We are not unmindful of the difficulty often presented to the courts to determine what constitutes an unlawful boycott, and to determine what acts come within the jurisdiction of the courts to enjoin and punish, and what belong to the legislative department to protect the public against. As already shown, injury, or even ruin, to one's business, may result from lawful competition and combination of either labor or capital, and, in such cases, the public are indirectly injuriously affected. In both England and in some of the United States these combinations, which are supposed to injuriously affect the public, have been the subject of legislation, and unlawful combinations have been defined, and punishment thereof provided. The aim of the courts has been, not to introduce into their decisions new principles, but to apply old and well-established ones, for the equal protection of all persons. In *Pasley* v. *Freeman*, 3 Term R. 63, Ashhurst, J., said:

"Where cases are new in their *principle*, there I admit that it is necessary to have recourse to legislative interposition in order to remedy the grievance; but where the case is only new in the *instance*, and the only question is upon the application of a principle recognized in the law to such new case, it will be just as competent to courts of justice to apply the principle to any case which may arise two centuries hence as it was two centuries ago. If it were not, we ought to blot out of our law books one-fourth part of the cases that are to be found in them."

This rule is recognized in *Arthur* v. *Oakes*, 11 C. C. A. 209, 63 Fed. 310 (25 L. R. A. 414), and by Justice CHAMPLIN in *Burke* v. *Smith*, 69 Mich. 395.

The case of *Allen* v. *Flood*, *supra*, is a forcible illustration of the difficulty, even in judicial minds, to agree. That case was really a contest between two labor unions, — the Shipwrights' Provident Union and a society of boilermakers and ironworkers. The latter denied the right of shipwrights to do ironwork upon vessels. The Glengall Company, for which both parties were at work, had a contract to repair a ship. Forty ironworkers and the plaintiffs, Flood and Taylor, shipwrights, were at work on the job. The ironworkers learned that plaintiffs had just before worked on a similar job, where they did ironwork, and called in Allen, their district delegate. Allen informed the agents of the Glengall Company that the ironworkers would quit work unless they discharged plaintiffs. The company discharged plaintiffs, but in doing so violated no contract, as they had the right to discharge them at any time. They, however, had an expectancy of continued employment, and but for the statement of Allen would have been retained. Flood and Taylor sued Allen in tort. A recovery was had in the trial court. The case was taken to the court of appeals, and sustained by a unanimous decision. It was then appealed to the house of lords, and the opinions of 8 judges were presented, 6 of whom were for sustaining the judgment. Of the 9 lords, 6 were against the judgment and 3 for it. Of the 21 judges and lords, 13 held the action of Allen to be

an unlawful interference with the freedom of labor, and actionable. This case, therefore, to other courts than those of England, is mainly instructive in the learned and exhaustive opinions rendered. The majority of the lords appear to have based their opinion upon the fact that there was no conspiracy; that the Glengall Company had violated no contract in discharging plaintiffs; and that the ironworkers had the right to leave, and to threaten to leave, their employment for any reason whatever.

The decree must be modified so as to enjoin picketing, the distribution of the boycotting circular, and all acts of intimidation and coercion.

The importance of this case, and the fact that no such case has before been presented to this court, constitute our excuse for the unusual length of the opinion.

The other Justices concurred.