CITIZENS' LIGHT, HEAT & POWER CO. v. MONTGOMERY LIGHT & WATER POWER CO.

(Circuit Court, M. D. Alabama, N. D.   July 22, 1909.)

1. INJUNCTION (§ 98*)—LIBEL AND SLANDER.
   Equity has no jurisdiction to enjoin written or spoken words defaming the credit and business standing of an individual or corporation; the remedy being by action at law or criminal prosecution.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 169-171; Dec. Dig. § 98.*]

2. INJUNCTION (§§ 63, 98*)—BUSINESS COMPETITION—FALSE STATEMENTS.
   False representations concerning complainant's credit, ability to do business, and solicitation of complainant's customers to break their contracts and trade with defendant, unaccompanied by incitement to violence to the customer's person or property, or illegal interruption of his contracts or relations with others, is not ground for injunction.
   [Ed. Note.—For other cases, see Injunction, Dec. Dig. §§ 63, 98.*]

---

*For other cases see same topic & §.NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. INJUNCTION (§ 104*)—CONSPIRACY.

Concert of action or agreement between defendant and his solicitors to spread defamation against complainant, its business rival, could only result in libel or slander, and hence could not be enjoined, though it amounted to a conspiracy to destroy complainant's business.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 177; ·Dec. Dig. § 104.*]

4. TORTS (§ 10*)—INTERFERENCE WITH BUSINESS.

At common law a trader or person in any calling, in order to get another man's customers, could use any means not involving violation of criminal laws or amounting to fraud, duress, or intimidation, or wrongfully inducing a breach of contract.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. § 10.*]

5. INJUNCTION (§ 63*)—BREACH OF CONTRACT.

Where complainant and defendant were business rivals, complainant was entitled to an injunction restraining defendant, its officers and employés, from inducing complainant's customers to break their contracts with complainant by agreeing to indemnify them against liability for damages to induce them to do so, when it is apparent, from the conduct of defendant in other respects, that the injury to complainants from loss of customers, thus destroying its ability to compete, could not be adequately compensated by damages at law.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 63.*]

6. MONOPOLIES (§ 8*)—UNLAWFUL COMPETITION—CONSTITUTIONAL PROVISIONS.

Const. Ala. 1901, § 103, providing that the Legislature shall have power to regulate and prohibit or reasonably restrain associations, trusts, monopolies, and combinations of capital, so as to prevent them from making any article of trade or commerce scarce, or from increasing unreasonably the cost thereof, or preventing reasonable competition in any calling, trade, or business, has not "restricted the law of competition," as defined by the common law.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*]

7. MONOPOLIES (§ 8*)—WHAT CONSTITUTES.

The control of a pursuit or trade in a locality is not forbidden by Const. Ala. 1901, § 103, though it be lodged in a single hand, if that be the result of competition waged by lawful means, as such a monopoly is a lawful one.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*]

8. MONOPOLIES (§ 12*)—CONTRACTS—ENFORCEMENT.

Contracts between two or more persons to obtain control of a pursuit or trade in a locality, or to keep up prices, are unenforceable.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

9. MONOPOLIES (§ 8*)—RESTRAINT OF TRADE—REASONABLE COMPETITION.

Under Const. Ala. 1901, § 103, authorizing the Legislature to provide for reasonable competition, one man may take over all of another man's customers, and thus control the business, if he does so as a result of competition within legal limits.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*]

In Equity.

This case is submitted on bill and amended bill and affidavits on motion for a preliminary injunction. The bill is filed by the Citizens' Light, Heat & Power Company against the Montgomery Light & Water Power Company. The former is a corporation chartered under the laws of ‾Alabama, and the latter under the laws of New Jersey. For convenience, they are hereafter respectively styled the "Citizens' Company," and the "Water Power Com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pany." They are competitors in the business of furnishing light and power by electricity to the people of Montgomery. The Water Power was first in the field, and the Citizens' Company was organized later, and from the start each has solicited the customers of the other, as well as the business of the people generally. Of late this competition has become intensified. According to the bills, the Water Power Company has lately put a corps of solicitors in the field to persistently seek the customers of the Citizens' Company and induce them to leave it, many of whom are known to be under contract with it, and has persistently stated, falsely and maliciously, that the Citizens' Company is insolvent, that there were dissensions in its management, that it would shortly go into the hands of a receiver, or go out of business, and they would have to become customers of the Water Power Company, when they could not get as favorable terms as now offered by it, if they would quit the Citizens' Company. It is further alleged, notwithstanding the falsity of these statements, and that the Citizens' Company has brought its action at law against the Water Company to recover damages for these defamatory statements, the latter company has since redoubled its efforts to take over the customers of the Citizens' Company, and still persists in circulating the defamatory matter, and through its officers and special corps of solicitors persistently offers to indemnify customers of the Citizens' Company, who are bound to it for a definite term, against breaches of their contracts, if they will go to the Water Company, and cease to do business with the Citizens' Company; that the Water Power Company has frequently taken business at less than cost to induce customers not to contract with the Citizens' Company, and has made repeated publications in the local press to the effect that there was no room here for two companies; that the Water Power Company was here to stay; and that by the means stated the Water Power Company is pursuing a systematic purpose to ruin the credit of the Citizens' Company, to demoralize and frighten its customers, to destroy the good will of the business, and thus to drive it out of the field, and to secure a monopoly of the business for itself.

The bill was afterward amended, giving the particulars as to the number of customers who were bound by contract for a definite term, and those who were taking electricity at will, but were not bound for a definite term, the income, etc. The effect on its business of the conduct complained of, and the ability of the Water Power Company, by the unlawful means pursued, to terrorize, frighten, or drive off, enough of the Citizens' Company's customers to make the patronage of the remainder insufficient to pay operating expenses, and thereby put the complainant out of business, or at grievous disadvantage, while its waiting to recompense itself by judgment in the law court, for the damage by the wrongful conduct of the defendant, is elaborately detailed. It is further alleged that the damage to the good will of the business cannot be accurately ascertained at law or compensated in damages, and that by reason of the premises complainant is without adequate remedy at law, and entitled to injunctive relief.

Aside from the prayer for general relief, the bill prays specially that the Water Power and its servants be enjoined and restrained, "from any effort, directly or indirectly, to induce or persuade any of the customers of the Citizens' Company to violate any subsisting contract to furnish electricity for a definite term," and the same relief is prayed as to customers who have not bound themselves to take the electric current for any definite term. The bill further prays that the Water Power Company, and its representatives, be enjoined and restrained "from making, either directly or indirectly, for the purpose of injuring or destroying the credit and financial standing or business of complainant, or giving out any statement, either oral or written, to the effect that the orator is insolvent, or in great financial straits, or on the verge of bankruptcy, or that it will very soon be out of business, or in the hands of a receiver, or that there are dissensions among its managing officers, or that it will not be able long to furnish electricity to said customers." The amended bill also prays that the Water Power Company and its representatives be enjoined from "attempting or undertaking by false or fraudulent representations as to the condition of the complainant, or its ability to perform its contracts, or by agreement to indemnify and hold harmless customers of

the Citizens' Company from liability for damages to complainant for breaches of contracts, and to induce any firm or corporation having a specific contract to take electricity from complainant for a fixed period, as aforesaid, to violate or breach said contract."

Fred S. Ball, J. M. Chilton, Gregory L. Smith, and R. T. Goodwyn, for plaintiff.

Steiner, Crum & Weil, for defendant.

JONES, District Judge (after stating the facts as above). This case has been ably and elaborately argued and has had most painstaking consideration. The public, as well as the parties, are deeply concerned in the important questions it involves, and no apology is needed for extended examination and discussion of them.

1. At the threshold of the case, we are met with the question of the power of the court of equity to enjoin written or spoken defamation of a man's credit and business standing. The difficulties in the way of affording such relief are insurmountable. They grow alike out of constitutional provisions, and want of jurisdiction in the court of equity. If the statements complained of are not false, defendant has a right to make use of them in getting business for itself. It affirms that these statements are true, while complainant insists they are maliciously false. Defendant has a right to have the truth or falsity of the issue determined by a jury trial as at common law. That it cannot get in a court of equity. A person cannot be enjoined from doing any act unless it is fairly apparent the act is wrongful, or the person sought to be enjoined has no right to do that act. How can a court of equity be satisfied where the right lays in the matter of the alleged false statements? It cannot try the question for itself, or determine the right in advance of the law court. Again, the Constitution forbids any law "to curtail or restrain the liberty of speech or of the press," and declares that:

"Any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Const. Ala. 1901, art. 1, § 4.

Neither a court of equity, nor any other department of government, can set up a censorship in advance over such matters, and prevent a person from exercising this constitutional right. He has the right to publish, if he chooses to take the consequences. After he has spoken or written falsely, the criminal law can punish him, and the civil courts amerce him in damages. That such redress may not be adequate in all cases, and in some cannot be, is quite apparent; but the remedies named are all that the Constitution permits any court to employ against slanders upon a man's credit and business standing. The court cannot go outside of the Constitution, or hold that to be an inadequate remedy which the Constitution has declared to be the sole remedy. The wrongs and injury, which often occur from lack of preventive means to suppress slander, are parts of the price which the people, by their organic law, have declared it is better to pay, than to encounter the evils which might result if the courts were allowed to take the alleged slanderer or libeler by the throat, in advance. It is bootless now, to inquire whether the courts, which first dealt with this matter, did not

unduly extend the privileges the constitutional provision intended to secure, by denying all power to deal in advance with the emanation of slander and libel by one private person upon another, where the only purpose of uttering them is to acquire personal gain, by wrongfully and wantonly aspersing a fellow man's reputation and business standing. However that may be, it was the law in England until changed by statute, and is the settled doctrine in this country, that a court has no such power.  Raymond v. Russell, 143 Mass. 295, 9 N. E. 544, 58 Am. Rep. 137; Kidd v. Horry (C. C.) 28 Fed. 773; Francis v. Flinn, 118 U. S. 385, 6 Sup. Ct. 1148, 30 L. Ed. 165; Marlin Fire Arms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; Flint v. Smoke Burner Co., 110 Mo. 492, 19 S. W. 804, 16 L. R. A. 243, 33 Am. St. Rep. 476; Edison v. Edison Chemical Co. (C. C.) 128 Fed. 957.

Nevertheless it is insisted the court has jurisdiction to enjoin the making and circulation of the false statements, in order to defeat a fraud upon complainant's customers, whereby they are wrongfully induced to breach their contracts with it, thus working a fraud upon complainant itself.  We have seen the constitutional trammels which prevent the court of equity from enjoining the making or circulation of the defamatory or libelous statements.  These trammels cannot be shaken off, and the jurisdiction of equity enlarged, by denouncing a mere libel as a fraud, no matter what the injury.  In Pomeroy's Equity Jurisprudence, § 630, it is said: "The grounds of interference must be more than injury to the property arising from the libelous character of the publication.  Thus the publication of the libelous circular will not be enjoined when the injury to the property arises from the falsity of the charge."  No question of disclosure of confidential matter is involved, and no relation exists between the parties except that of rivals fighting each other at arm's length.  The "intimidation" and "frightening" of complainant's customers, which complainant insists is effected by the false statements, does not amount to coercion or intimidation in the eye of the law.  In their circulation it is not alleged that violence was threatened to the customer's person, or injury to his property or business, or interruptions of his relations with other persons.  Appeals to self-interest only, based on a statement of facts, false though they may be, are addressed to the customer, from which he may deduce the conclusion that it is more to his advantage to deal with the solicitor than to remain with the complainant.  The customer is left free to form his own judgment and take his own choice.  He has been deceived, it may be; but he has not been threatened, intimidated, or coerced.  Surely no one would claim that a person who was deceived in swapping horses by willfully false representations as to the superior quality of the horse he got, compared with the horse he parted with, or the benefit to result in consequence of the bargain, had been coerced or intimidated, or frightened into making the swap.  He has merely been outwitted and deceived.  Hence the case does not fall within the influence of Beck v. Railway Teamsters' Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421, and kindred cases, wherein it is properly held that the constitutional provision as to the freedom of the press and liberty of speech cannot prevent injunctive relief against the circulation of printing, or the speaking of words, the natural effect of

which, under the circumstances, is to convey a threat to bring about violence to person or property, or boycotts, or the like injury to the business of those to whom the writing or words refer, or will naturally be applied.

It is strenuously insisted, in view of defendant's alleged purpose to compass the ruin of complainant's business, by the several means recited, that the employment of solicitors to spread the objectionable matter, and their constant iteration of it to complainant's customers, amounts to a conspiracy to destroy a property right under such circumstances that a court of equity must intervene to prevent irreparable injury. Concert among a number of persons to effect an unlawful purpose will frequently authorize a court of equity to intervene, when it could not grant such relief against like acts of a single individual. The right of the court of equity to interfere at all turns upon the consideration whether the conduct complained of would result in a wrong which a court of equity has power to prevent at any stage of its accomplishment. A court of equity has no power to prevent the invention or circulation of slanders upon men's business standing and credit. Concert or agreement between defendant and its solicitors to spread the defamation complained of can only result in libel or slander, and that a court of equity cannot prevent whether effected by one or many persons.

2. The next important question is, what play is allowed, under our laws as they stand, to the operation of what is indiscriminately termed in the books the "law of trade," the "law of competition," and the "law of supply and demand," and how far the Legislature can interfere? These are questions which have vexed the legislator and the political economist for centuries, and they daily become more acute under the influence of the forces, good and bad, which shape modern industrial development, and the struggles between man and man which they call forth. Hence, in this class of cases, not only legislators are appealed to for new remedies, but there is constant pressure upon courts of equity to enlarge the application of the principles upon which its justice has been heretofore administered regarding the invasion of property rights. It is said modern conditions differ so essentially in those matters from the old conditions, under which these rules originated, that courts of equity should keep pace with the changed conditions by more freely granting injunctive relief. It is urged, if one individual or the other falls by the wayside in the struggles of competition in the ordinary private callings, it matters little to the community, for others will take their places and serve its wants; while, on the other hand, competition between enterprises affected with a public interest may inflict great harm upon the community. When the struggle is between enterprises, which in the nature of things require large outlays, and only a few can engage or work in them with profit, in a given locality, and they exercise franchises, under which they supply the wants of a community in things like water, heat, power, or transportation, that community is profoundly interested and may suffer great harm from the outcome of the struggle. When one competitor drives another from such a field, the victor often becomes the sole master of it, and then, not only a competitor is ousted, but the law

of competition is itself "put out of business." Courts of equity therefore, it is insisted, should, when called upon to intervene against wrongs in such struggles, abandon, in view of the great public interests, some of their ancient rules as to what constitutes adequacy of remedies at law, and freely grant preventive remedies in this class of cases to prevent success of efforts to monopolize trade, though it might not be appropriate in the prevention of torts and wrongs in other relations of life.

However captivating such a theory, and I confess it appealed to me somewhat, at first blush, in view of the nature of the grievances alleged in the bill, a little reflection will convince one that it should be rejected. Granting the wisdom of the courts to grapple with such problems, the practical operation of the doctrine would be disastrous in the extreme. Each judge would have his own policy. The policy of the law would swing like a pendulum, hither and thither, in cases as they arose, as the particular judge made choice between the teachings of the different schools of political economy. Confusion and uncertainty would reign where uniformity and certainty are above all things desirable. Courts in this, as in all other matters, can take no safe path save to follow the policy of the law only, as the Constitution, statutes, and common law disclose it, and enforce it, as thus disclosed, regardless of their own notions, whatever may be the hardships of particular cases.

What is the policy of our laws as to competition in matters of this sort, and what results may lawfully be effected under it? The answer necessitates an examination of the common law, and how far it has been changed by our Constitution and statutes. What was the rule at common law?

As Lord Chief Justice Coleridge observed in Mogul Steamship Co. v. McGregor, 21 Queen's Bench Division, Law Reports, 553:

"It must be remembered that all trade is, and must be, in a sense, selfish; trade, not being infinite, nay, the trade of a particular place or district being possibly very limited, what one man gains another loses. In the hand to hand war of commerce, as in the conflicts of public life, whether at the bar, in Parliament, in medicine, in engineering (I give examples only), men fight on without much thought of others, except a desire to excel or defeat them. Very lofty minds like Sir Philip Sidney, who with his cup of water will not stoop to take an advantage if they think another wants it more. Our age, in spite of high authority to the contrary, is not without its Sir Philip Sidneys; but these are counsels of perfection which it would be silly indeed to make the measure of the rough business of the world as pursued by ordinary men of business. * * * The defendants are traders with enormous sums of money embarked in their adventures, and naturally and allowably desirous to reap a profit from their trade. They have a right to pursue their lawful trade by all lawful means. They have a right to endeavor by lawful means to keep their trade in their own hands, and by the same means to exclude others from its benefits, if they can. Amongst lawful means is certainly included the inducing by profitable offers customers to deal with them rather than their rivals. It follows that they may, if they think fit, endeavor to induce customers to deal with them exclusively by giving notice that only to exclusive customers will they give the advantage of the profitable offers. I do not think it matters that the withdrawal of the advantages is out of all proportion to the injury inflicted on those who withdraw them by the customers who decline to deal exclusively with them, dealing with other traders. It is a bargain which persons in the position of defendants here had a right

to make, and those who are parties to the bargain must take it or leave it as a whole."

At common law a trader, or person in other callings, in order to get another man's customers, could use any means not involving violation of the criminal laws, or amounting to "fraud," "duress," or "intimidation," as the law understands and applies those terms to transactions between man and man, or to his becoming a wrongful party to a breach of another man's contract. The trader may boast untruthfully of the merits of his wares, so long as it does not take the form of false statements, amounting to slander or willful misrepresentation of the quality of a rival product, or a libel upon the character, business standing, and credit of his rival, or an effort to induce the public to believe that the product he sells is that manufactured and sold by the rival. He may send out circulars, or give information verbally, to customers of other men, knowing they are bound by a contract for a definite term, although acting upon the expectation and with the purpose of getting the trade of·such persons for himself. He may use any mode of persuasion with such a customer, keeping within the limitations stated, which appeals to his self-interest, reason, or even his prejudices. He may descant upon the extent of his rival's facilities compared with his own, his rival's means, his insolvency, if it be a fact, and the benefits which will result to the customer in the future from coming to the solicitor rather than remaining where he is. He may lawfully, at least so far as his rival is concerned, cut prices to any extent, to secure his trade. So long as what he does is done to benefit his own trade, and, in taking over the customers of another, he keeps within the limitations heretofore defined, he is safe from legal restraint at the instance of a competitor in following "the law of competition," which takes little note of the ordinary rules of good neighborhood or abstract morality. The person whose customers are thus taken from him cannot complain, for no right of action lies in his favor against him who solicited his customer, since the solicitor exercised a legal right in a legal way, and the exercise of a legal right in a legal way, for a lawful purpose, will not give a cause of action. Allen v. Flood, Law Reports, Appeal Cases, 1898, p. 1, which on this point is not disturbed by the later judgment of the House of Lords, in Quinn v. Leatham, Law Reports, Appeal Cases, 1901, p. 495.

It may be difficult for the mere casuist to distinguish between the nonactionable character of a man's acts, when he solicits another man's customer whom he knows is bound by a subsisting contract, expecting and intending thereby to take over the business, when the ordinary, natural, and intended result of such conduct is the breach of a contract, and the actionable character, on the other hand, of such conduct with another man's customer when the solicitor goes further than mere solicitation, and in the words of Lord Brampton, in Quinn v. Leatham, supra, is guilty of "active interference." The distinction, however, is perfectly logical. The trader who has made a contract with another person has a right, which the law will protect, to have that other keep it.· Other traders have the correlative right to solicit the custom to which the contract relates. Whatever damage results to

the first trader by the mere solicitation is privileged, so far as the solicitor is concerned, in the interest of proper freedom of competition. Were the law otherwise, the first person occupying the field of public service in many localities, by procuring long contracts to take water, light, and the like from him, might intrench himself in a monopoly there for years, because another thereafter could not solicit customers, thus bound, to change their patronage to him, and thereby enable a rival enterprise to enter the field. The faithful observance of contracts, however, is as essential to the public welfare as the right of competition. Property rights, public and private morality, and liberty itself, are insecure, when the law encourages the nonobservance of contract obligations. Hence, while the law allows a trader, by mere solicitation, to persuade customers to change their business relations, without actionable liability therefor, though a broken contract is the result, it does not permit such a solicitor even in the interests of competition, to go further, intervening actively between the contracting parties, as a dominant agency in producing a breach, by promise of indemnity to one of them to induce the breach. When the solicitor knowingly and intentionally goes beyond mere solicitation, to induce another man's customer to do business with him, and promises to hold that other man's customer harmless for the breach of a contract with him, he transcends the rights of the law of competition, has no "sufficient justification," and thereby becomes liable to him whose customer is taken over. Such conduct is an unlawful interference with another man's rights, for which he may maintain an action and recover nominal damages, although the contract be not actually breached in consequence of the solicitation. While there are some authorities to the contrary, the current of authority in this country and in England is that:

"The violation of a legal right committed knowingly is a cause of action, and that it is a violation of a legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference." Quinn v. Leatham, supra, 510; Angle v. Chicago, etc., Ry. Co., 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55; Martens v. Reilly, 109 Wis. 464, 84 N. W. 840; Rice v. Manley, 66 N. Y. 82, 23 Am. Rep. 30; Bitterman v. L. & N. R. R. Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171; Beekman v. Marsters, 195 Mass. 205, 80 N. E. 817, 11 L. R. A. (N. S.) 201, 122 Am. St. Rep. 232; South Wales Miners' Fed. v. Glamorgan Coal Co., Appeal Cases, 1905, p. 239. See, also, Nims on Unfair Business Competition, pp. 351–371.

3. Our state Constitution and statutes have not narrowed the play of the law of competition as defined at the common law. Const. Ala. 1901, § 103, declares:

"The Legislature shall have power to provide by law for the regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade or business."

The section is aimed at combinations of capital, to prevent them from making scarce articles of necessity, in order to "unreasonably" increase the cost to the consumer, and, further, to prohibit anything which prevents "reasonable competition" in any calling or business. Combina-

tions of capital as such are not denounced. To fall within the purview of the section they must be formed to "unreasonably" increase the cost. The section is not aimed at everything which restricts competition. Its purpose is not that there shall be no restraints of competition, arising from the workings of the laws of trade, but only that whatever is done in trade must leave the field open to "reasonable competition." The indirect effects of fair competition, though in the end it may result in restraining competition, by lessening the number who compete, or in some instances throwing all the trade into the hands of one man, are not outlawed as going beyond the limits of "reasonable competition." That competition is the life of trade has passed into "a proverb of the law." The section intends to preserve its full operation. Putting the qualifying word "reasonable" before the word "competition" could have no other purpose than to declare the intent that restrictions arising from the inevitable effect of competition, lawfully conducted, were not intended to be prohibited—that the "reasonable competition" for which the Constitution provides did not intend to free competition from the effects, direct or indirect, of any rivalry in trade waged within the bounds of law. If it meant more, competition would be impossible, since all competition, more or less, diminishes, restrains, or restricts the trade of others. The terms "reasonable" and "unreasonable" were used with reference to the meaning of these words, as understood and applied in our jurisprudence in the past, in defining what was noxious interference with trade and commerce, as distinguished from lawful rivalry. To give the section any other meaning would defeat its dominant purpose to have "reasonable competition."

Section 2487 of the Code of Alabama of 1907 sheds no light upon the question here. Without attempting any definition of "unreasonable restraints," or "reasonable competition," the section simply gives a penalty and right of action for any injury, "direct or indirect," resulting from the violation of the law. Section 7581 of the Code reads:

"Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, control or sale of a commodity, or prosecution, management, or control of any kind, class, or description of business; or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense."

It will be noticed at a glance that it goes far beyond the Constitution, which, by the affirmative terms in which it confers the power, inevitably negatives any legislative power to enact anything contrary to the policy of the fundamental law. It makes no distinction between "reasonable" and "unreasonable" restraints. It forbids any "attempt" to restrain the freedom of trade, whether direct or indirect, whether accomplished by illegal means, or as the inevitable result of competition lawfully conducted. It forbids any "attempt" to "control" any kind of business, or any "attempt" to "destroy competition," no matter by what means effected. According to the letter of the section, free competition would be impossible, since all competition, however lawfully conducted, necessarily results in a large measure in restricting competition, or interfering with another man's ability to compete, and hampers the practical

enjoyment of the right to compete in many instances. When only two are engaged in a business in a locality, the effect of competition is often to put the whole business into the hands of one, thereby creating a monopoly. It puts the "control" of the business in one man's hands. Yet this monopoly is the child of "reasonable competition," which the Constitution intends shall have full play. Under this section, if it be taken at its word, such competition, from its known and direct tendency in restraining trade, would be forbidden. This section can throw no possible light upon the meaning of the Constitution, or be useful in any way in ascertaining the meaning of its terms. If it means only to forbid things the Constitution forbids, we must look to the Constitution, rather than to it, to discover the purpose of its framers. If it means more or is in any wise antagonistic to the Constitution, it is void. Finding no definition of the meaning of "unreasonable restraints" and "reasonable competition" in our Constitution and statutes, resort must necessarily be had to the common law. At the common law all competition in trade, conducted within the limits of the law, was "reasonable competition." Mogul Steamship Co. v. McGregor, supra. The "control" of a pursuit or trade in a locality is not forbidden by the Constitution, though it be lodged in a single hand, if that be the result of competition waged by lawful means. Such a monopoly is not an unlawful monopoly. Contracts or agreements between two or more persons to obtain such a result, or to keep up prices, are, of course, unenforceable, and statutes frequently make them not only illegal, but criminal; but fiercely waged competition between rivals, within the limits of the law, may bring about just such results. The law does not condemn them, for they are, in the nature of things, the inevitable results of the "reasonable competition," which the Constitution secures to all alike. If, as we have seen, one of these competing companies, keeping within lawful means, may continue to compete with the other until it drives it out of business altogether, and thus lawfully secures a monopoly to itself, advertisement in the newspapers or in other ways, of a purpose to continue the struggle until that result is secured, cannot make that an unlawful monopoly, which without that announcement would be lawful. National Protective Association v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648. The reason, of course, is that the doctrine has been generally accepted that competition is worth more to society than it costs, and that on this ground the infliction of damages is privileged. Commonwealth v. Hunt, 4 Metc. (Mass.) 111–134, 38 Am. Dec. 346.

4. It has been pressed upon the court at every turn of the argument, that while ordinarily it might not have power to interfere by preventive writs, yet that in a grievance of this kind, presenting a case of peculiar hardship, a court of equity has the power, and is under duty, to interfere by injunctive relief, because in so doing it would be enforcing the policy of the Constitution and prevent the accomplishment by one competitor of an avowed and undoubted purpose, by means fair or foul, to drive his rival to the wall, and thus defeat the very purpose of the Constitution in securing "reasonable competition." As we have seen, there are constitutional difficulties in the way of suppressing the injury resulting either from circulation of defamation, or of lawful solicitation of customers. Under the Constitution, and in the absence

of statutes defining the power of the state, under section 103 of the Constitution, to regulate. competition, one man may take over all of another man's customers, and thus control a business, if it results from competition within legal limits. If we assume the power of a court of . equity to prevent such a result by defining limits beyond which even lawful means shall not be used to get control of a business, thus stifling competition in it, upon what principle can the court proceed? If the taking over of a certain number of customers, though by illegal means, does not create monopoly, while the taking over of a greater number does, how is the court to determine what number falls within and what number falls without the rule? Is the taking over of the individual customer to depend on the motive of the solicitor to get all the trade, or only a fair portion? Can the court apportion the business among the rivals? Can it say, in order to prevent monopoly in a business, that one company should be confined in a business to one part of the town, and another to another part, in order to prevent one from destroying the business of the other? If the court could enter upon these inquiries, the difficulties in their practical application would be insuperable. The exercise of the power would be an attempt to direct "reasonable competition" by regulations which the Legislature alone can lawfully provide. The Legislature has not provided them. The court would simply be legislating, using its injunction to promulgate and enforce its enactment.

5. We have here a case where it may or may not be true that the defendant has inflicted great harm upon complainant's business by the alleged defamatory statements. The course of conduct pursued towards it by its rival in offering indemnity against breaches of its customers' contracts, combined with the effect of the other grievance alleged, if it·exists, may result in reducing the number of its customers below that at which the business could be run at a profit, thereby forcing it to run, for a time, at least, below cost; and finally putting it out of business or grievously taxing its resources, while it is waiting the slow process of the law to recover damages for the alleged defamatory statements, and of customers who breached their contracts with it, and from the persons who have wrongfully induced them to do so. Necessarily there must be considerable delay at law. If many suits be brought, and the dockets of the courts be crowded, months must elapse before complainant could get its numerous suits tried. If complainant be successful, and its adversaries be litigious, they would carry the cases to the appellate court, and a year or two, even under the most favorable circumstances, must elapse before complainant could be recompensed by receipt of damages, to say nothing of the cost and expense to complainant in its numerous suits at law. Meanwhile the opportunity to increase its business and build up its good will is wrongfully put in jeopardy.

Can one competitor say, in effect, to another, and, without any effective check, carry out the threat: "I will libel your credit and business standing, and indemnify your customers for breaches of your contracts, as often as I choose, and risk your suits for defamation and for causing breaches of your contracts, and pay the damages, if by so doing I can put you out of business. I intend to persist in such

means until I force you to sell or perish and leave the field for me." What chance of life has the weaker against the stronger under such conditions, if the weaker must wait the slow aid of the law court? True it is, by suits at law against its customers, and those who procure them by unlawful means to leave it, the weaker competitor could recover damages by way of loss of profits against the customer, and all actual damages, as of right, and it may be smart money, against the main tort-feasor; but is that adequate compensation for the wrong? The wronged competitor may be forced to succumb from loss of customers under the constant hammering of them accompanied by offers of indemnification. The difference in the value of the good will of the business if it be conducted in the face of continued unlawful assaults, as compared with what would be its value and extent if battling only with lawful competition, is largely speculative, incapable of accurate ascertainment, and cannot therefore be measured or fitly compensated in damages. The complainant has a right to conduct its business, and extend it as far as it can, free from illegal assaults by a rival. It is to the public interest that it enjoy that right. Complainant has the right to choose for itself whether it will wait the slow process of the law courts, and submit to all the disadvantages which will thereby be entailed upon it, or whether, in its own interest, and for the promotion of its business, it will resort to the court of equity to minimize the damage from the continuation of the wrongful assaults, by preventing the recurrence of them in the future. The inadequacy of the remedy at law under such circumstances binds a court of equity to interpose its preventive remedies to that extent. If there were doubt, the public interest and the duty to uphold the constitutional policy of "reasonable competition" should turn the scale.

I do not find the defendant's contention that complainant does not come into court with clean hands is sustained. A number of affidavits have been offered that complainant repeatedly solicited defendant's customers to come to it; but it is not shown in any of these solicitations that complainant exceeded the limits of loose morality of the law of trade, or that they were accompanied by offers of indemnification if customers would break their contracts with defendant.

The court cannot grant the prayer of the complainant to stop the solicitation of its customers within lawful limits, for that would be offensive to the policy of the law, and would be building up, rather than destroying, monopoly. To enjoin such solicitation would be to enjoin the "reasonable competition" the Constitution secures to every one. The court cannot say to the defendant it shall not make lawful solicitations in the future of complainant's customers, because defendant in the past has attempted to build up its business and compete in an unlawful way. It cannot prevent the circulation of the alleged defamatory matter, because it has no jurisdiction to determine such questions in advance of a trial at law. Under the circumstances the court should prevent the wrong of indemnifying complainant's customers for breaching their contracts, and has the power to do so.

All the prayers for relief must be denied, save in the matter of indemnifying complainant's customers against breaches of their contracts, as to which a preliminary injunction will be granted.