Dr. Lietzman, Dentist, Inc., Appellant, v. Radio Broadcasting Station W. C. F. L. et al., Appellees.

Gen. No. 37,948.

204

Opinion filed November 5, 1935.

AARON SOBLE, of Chicago, for appellant; IRVING GOODMAN, of Chicago, of counsel.

FINK & DANIELS, of Chicago, for appellees; MEYER FINK and MAX DANIELS, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Complaint for an injunction was filed September 7, 1934, by plaintiff, Dr. Lietzman, Dentist, Inc., an Illinois corporation, to restrain Radio Broadcasting Station W. C. F. L., Chicago Federation of Labor, John Fitzpatrick, president of Chicago Federation of Labor, E. N. Nockels, general manager of Radio Broadcasting Station W. C. F. L., and Dental Laboratory Workers' Union No. 19358 from continuing a certain radio broadcast. September 11, 1934, a motion was made for a temporary injunction, which was granted by Judge Daniel P. Trude. October 16, 1934, on motion of defendants, an order was entered by Judge Klarkowski

dissolving the temporary injunction and dismissing plaintiff's complaint for want of equity. This appeal followed.

The complaint alleges substantially that plaintiff is the successor to the Boston Dental Parlors, an Illinois corporation, also known as the Boston Dentists; that plaintiff "has impressed itself on the public as almost synonymous with the Boston Dental Parlors"; that any disparaging or prejudicial remarks about the Boston Dental Parlors or the Boston Dentists would necessarily injure plaintiff's business; that plaintiff has expended large sums of money in building up its good name and reputation in the dental business; that it is necessary that it enjoy and continue to hold the confidence and good will of the public; that defendants are "conspiring and confederating" and are unlawfully, maliciously and libelously slandering the good name and reputation of the Boston Dental Parlors, the Boston Dentists and plaintiff, its successor, by broadcasting over radio station W. C. F. L. false and injurious statements "about the good name of plaintiff and making libelous and misleading" statements about the "business policies of plaintiff and urging the radio listening public not to patronize plaintiff's dental parlors"; that defendants, by their representatives, employees and agents "have from time to time and are now" causing to be broadcast such statements as follow:

"Dental Laboratories Workers' Union No. 19,358 wish to inform the public that Boston Dental Parlors are non-union so far as organized labor is concerned, as they will not permit collective bargaining. We would suggest that you patronize other dental parlors for your necessary dental work if you are interested in fair, impartial treatment for the working man.

"The Boston Dentists who have several offices about town should not be patronized because they are interfering with the Dental Laboratories Workers' Union.

They are in direct opposition to the industrial act and should not be patronized.

"The Boston Dental Parlors operating throughout Chicago and nearby towns are unfair to President Roosevelt and the N. R. A. The Boston Dentists should not be patronized; they refused their laboratory workers permission to sign with organized labor, and are operating in defiance of Section A-1 of the National Recovery Act."

It is further alleged that the above and similar statements have been and are being broadcast by defendants almost nightly over radio station W. C. F. L., with the express intent of destroying the business and good name of plaintiff with the public; that the "statements" broadcast are untrue and that plaintiff is "not unfair to President Roosevelt," is not "unfair to the N. R. A.," and "is fair to labor"; that defendants are unlawfully and maliciously conspiring and confederating to intimidate and coerce plaintiff and its employees into "recognizing and accepting an alleged Dental Laboratory Workers' Union"; that they and each of them are seeking to gain this end by illegally persuading and advising the public to boycott plaintiff's dental parlor; that the aforesaid broadcasts of defendants have caused and are causing irreparable and grievous damage to plaintiff's business; that same will be irreparably and irremediably destroyed and ruined unless the court restrains defendants and each of them "from broadcasting the defamatory statements hereinbefore set forth and similar statements" prejudicial to plaintiff's business; and that plaintiff has no adequate remedy at law. The prayer of the complaint is that defendants be restrained "from broadcasting on the radio or otherwise publishing" any malicious or derogatory statements "that the Boston Dental Parlors or the Boston Dentists or plaintiff or either of them are unfair to President Roosevelt or unfair to the N. R. A., or unfair to the working man or to organized

labor, and in any way urging, advising or instructing the public not to patronize plaintiff's dental parlor''; and that defendants be restrained from ''confederating and conspiring to interfere with the dental business of plaintiff by urging the public to boycott plaintiff's dental parlors or from broadcasting any statements tending to undermine the good will, good name and confidence of the public in plaintiff's dental parlors or from interfering with the business relations between plaintiff and its dental employees, and from breeding ill will, hatred and distrust between plaintiff and its dental employees.''

As ground for dismissal of the complaint defendants stated in their motion that plaintiff had an adequate remedy at law; that there are no facts alleged showing conspiracy; that equity will not restrain the publication of a libel; that the words complained of are not libelous; and that the injunction prayed for would be in violation of the constitutions of the United States and of the State of Illinois.

Plaintiff contends that broadcasting false and defamatory statements over the radio about its dental business and urging the public to boycott its dental parlors constitutes such a wrongful interference with its business and property as to warrant injunctive relief by a court of equity; and that the right of free speech as guaranteed by the constitution of this State and by the constitution of the United States does not confer the right to publish repeated false and defamatory statements, which are intended to destroy the dental business of plaintiff.

Although what preceded or actuated the broadcasts is not alleged in terms, it is reasonable to infer that it was an attempt on the part of the Dental Laboratory Workers' Union to organize plaintiff's laboratory workers and have them join the union, which was either opposed or thwarted by plaintiff.

The gist of the complaint is that defendants entered into an unlawful combination or conspiracy to intimidate plaintiff and its employees into recognizing the Dental Workers' Union by advising the public to boycott plaintiff's dental parlors. The motion to dismiss the complaint admits all of the well pleaded allegations contained therein, but it admits none of the conclusions or inferences drawn by the pleader. (*Lindemann & Hoverson Co. v. Advance Stove Works,* 170 Ill. App. 423; *Betten v. Williams,* 277 Ill. App. 353.) A careful examination of the complaint discloses that the charge of conspiracy is a mere conclusion without any foundation of facts. No facts are alleged to show either that a conspiracy existed among defendants or any of them or that the Chicago Federation of Labor, John Fitzpatrick, president of Chicago Federation of Labor, Radio Broadcasting Station W. C. F. L., or E. N. Nockels, its general manager, said or did anything either of a lawful or unlawful nature to interfere with or injure plaintiff in the conduct of its business. The only specific allegation of fact in the complaint connecting any of the defendants with plaintiff's claimed injury to its business is that charging the Dental Laboratory Workers' Union with making broadcasts over radio station W. C. F. L. Other than that the broadcasts were permitted to be made over that station and that Nockels was its general manager, the complaint contains no averment that even attempts to charge either the station or Nockels with being or having been in a conspiracy with the Dental Laboratory Workers' Union or anybody else. It is a matter of common knowledge that radio station W. C. F. L. is operated under the auspices of the Chicago Federation of Labor, and it is also a matter of common knowledge that its facilities are not used exclusively for that organization's business and activities. It is not even charged that the Dental Laboratory Workers' Union was a member of or affiliated with the Chicago

Federation of Labor, and to urge that the mere broadcasts or the permission to make them over the aforesaid station is sufficient to properly charge an unlawful conspiracy against the Chicago Federation of Labor, John Fitzpatrick, its president, radio station W. C. F. L., and Nockels, is no more logical or reasonable than it would be to say that any other broadcasting station, its manager, and its sponsor, would be guilty of conspiring with one of its clients simply because such client used in its broadcast matters that were scandalous, libelous or of a defamatory nature. While, under such circumstances in a proper case, those who owned or controlled such broadcasting station might be held liable in an action at law for any resulting injury or damage caused by permitting the use of its facilities for the dissemination of the scandal or libel, it could hardly be held to have been in an unlawful conspiracy with its broadcasting client. In our opinion, it is not sufficiently charged in the complaint that an unlawful conspiracy against plaintiff existed or that defendants or any of them were a part of an unlawful combination to interfere with its business.

In any event will equity afford injunctive relief against the publication of a mere scandal or libel?

It is not charged that defendants' unlawful conduct consisted of anything more than broadcasting the statements heretofore alluded to, including the suggestion that for the reasons indicated plaintiff's business should not be patronized.

While plaintiff charges that the statements contained in the radio broadcasts constituted a "boycott" intended to "intimidate" it into "recognizing and accepting" defendant union, we think that the alleged false statements and objectionable matter in the broadcasts do not amount to coercion or intimidation in law, either of plaintiff or its clients or patients, present or expectant. The public, including the friends of

organized labor to which the appeals were made, may have been deceived by the false statements if such they were, but it was left free to form its own judgment and make its own choice. Neither the public generally nor the members or friends of organized labor were coerced, intimidated or frightened by anything contained in the broadcasts. No threats of violence were made against either plaintiff, its business or property. (*American Malting Co. v. Keitel,* 209 Fed. 351.)

In the *American Malting* case, *supra,* where the law on the question is exhaustively reviewed, the court said at pp. 354–356:

"For 150 years it has been understood in England that equity had no jurisdiction to enjoin a libel, and the power of the courts of that country to do so rests upon statute.

"In the United States a like view of the matter has been taken. In Pomeroy's Equity Jurisprudence, vol. 6, sec. 629, it is laid down that:

" 'Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States and was formerly the rule in England. The present rule in England rests on statute.'

"In High on Injunctions (4th Ed.) sec. 1015, that writer states that the doctrine which seems most in accord with the principles governing the jurisdiction of equity by way of injunction is that, the preventive jurisdiction being limited to the protection of property rights which are remediless by the usual course of procedure at law, courts of equity will not restrain the publication of libels or works of a libelous nature, even though such publications are calculated to injure the credit, business, or character of the person aggrieved, and that he will be left to pursue his remedy at law. In a case in the Supreme Court of the United

States (1885), *Francis v. Flynn,* 118 U. S. 385, 56 Sup. Ct. 1148, 30 L. Ed. 165, Mr. Justice Field said:

" 'If the publications in the newspapers are false and injurious, he can prosecute the publishers for libel. If a court of equity could interfere and use its remedy of injunction in such cases, it would draw to itself the greater part of the litigation properly belonging to courts of law.'

"In 1886 the question arose in the Circuit Court for the Third Circuit in *Kidd v. Horry,* 28 Fed. 773. An injunction was asked to restrain the defendants from publishing certain circular letters concerning the business of the complainants. The injunction was refused. The opinion was by Mr. Justice Bradley, who said:

" 'But neither the statute law of this country nor any well-considered judgment of the courts has introduced this new branch of equity into our jurisprudence. There may be a case or two looking that way, but none that we deem of sufficient authority to justify us in assuming the jurisdiction. . . . We do not regard the contrary decision in *Croft v. Richardson,* 59 How. Prac. (N. Y.) 356, as of sufficient authority to counteract these cases or to disturb what we consider to be the well-established law on the subject. That law clearly is that the court of chancery will not interfere, by injunction, to restrain the publication of a libel. . . . We do not think that the existence of malice in publishing a libel or uttering slanderous words can make any difference in the jurisdiction of the court. Malice is charged in almost every case of libel, and no cases of authority can be found, we think, independent of statute, in which the power to issue an injunction to restrain a libel or slanderous words has ever been maintained, whether malice was charged or not. Charges of slander are peculiarly adapted to and require a trial by jury; and exercising, as we do, authority under a system of government and law which by a

fundamental article secures the right of trial by jury in all cases at common law, and which by express statute declares that suits in equity shall not be sustained in any case where a plain, adequate, and complete remedy may be had at law, as has always heretofore been considered the case in causes of libel and slander, we do not think that we should be justified in extending the remedy of injunction to such cases.'

" . . .

"In 1909 the question arose in the Fifth Circuit (*Citizens' Light, Heat & Power Co. v. Montgomery Light & Water Power Co.* (C. C.) 171 Fed. 553), and the court held that equity had no jurisdiction to enjoin a libel or slander defaming the credit and business standing of an individual or corporation. The court said:

" 'The difficulties in the way of affording such relief are unsurmountable. They grow alike out of constitutional provisions and want of jurisdiction in the court of equity.'

"In 1907 the question arose in the Eighth Circuit (*Montgomery Ward & Co. v. South Dakota Retail Merchants' & Hardware Dealers' Assoc.* (C. C.) 150 Fed. 413), and the court refused the injunction, saying:

" 'In the jurisprudence of the United States there is no remedy for the abuse of this right (to freely speak, write and publish) conferred by the Constitution, except an action at law for damages or a criminal proceeding by indictment or information.'

"In 1912 the question was before a District Court in Missouri (*Vassar College v. Loose-Wiles Biscuit Co.*, 197 Fed. 982). The bill was dismissed; the court saying:

" 'In this country a court of equity is without jurisdiction to restrain the publication of a libel.'

"The state courts in a number of cases have held that the jurisdiction of equity did not extend to libels and have refused injunctions to restrain their publi-

cation. *Boston Diatite Co. v. Florence Mfg. Co.*, 114 Mass. 69, 19 Am. Rep. 310 (1873); *Marlin Firearms Co. v. Shields*, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310 (1902); *Baltimore Life Ins. Co. v. Gleisner*, 202 Pa. 386, 51 Atl. 1024 (1902); *Mayer v. Journeyman Stone-Cutters' Assoc.*, 47 N. J. Eq. 519, 20 Atl. 492 (1890).

" . . .

"In all that has been said we have not lost sight of the fact that the courts have sometimes issued injunctions to restrain the publication of false statements injurious to business or property. The cases in which such a jurisdiction has been assumed have been those which have involved conspiracy, intimidation, or coercion. In 22 Cyc. 900, it is laid down:

" 'A court of equity has no jurisdiction to restrain a mere libel or slander. Nor does the fact that the false statement may injure plaintiff in his business or as to his property constitute a sufficient ground for an injunction, in the absence of acts of conspiracy, intimidation, or coercion.' "

We have quoted extensively from this opinion because it announces the settled law of practically every jurisdiction in this country, including Illinois.

Inasmuch as the alleged false statements could constitute nothing more than mere libel or slander, carrying with them only a peaceful suggestion or appeal to the public not to patronize plaintiff for the reasons given, the elements of intimidation and conspiracy to boycott are obviously injected into this controversy to bring it within the exception to the rule that equity will not intervene and restrain a libelous or slanderous publication, unless it is an adjunct of, coupled or linked with, or an incident to conspiracy, intimidation or coercion. We have already shown that neither intimidation nor coercion in law occur in this case and that no unlawful conspiracy is sufficiently alleged.

Assuming that a conspiracy is properly alleged, do any of the statements complained of constitute a boycott in the legal sense? Justice Taft in *Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co.*, 54 Fed. 730, defined a boycott as follows:

"As usually understood, a boycott is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them."

In *Beck v. Railway Teamsters' Protective Union*, 118 Mich. 497, it was held that the boycotting of one who refuses to accede to demands of the union is unlawful, where the means used to prevent persons from dealing with the person boycotted are threatening in their nature, and tend naturally to overcome, by fear of loss of property, the will of others, and compel them to do what they would not otherwise do, although such means are unaccompanied by actual violence or threats of violence.

In *American Federation of Labor v. Buck's Stove & Range Co.*, 33 Appeal cases, Dist. of Col. 83, after citing many decisions of the federal and state courts throughout the country, it was said at p. 106:

"From these decisions it will be gathered that the boycott, as generally understood, is a combination to harm one person by coercing others to harm him."

It is apparent that the mere suggestion to the public not to patronize plaintiff's business for the reasons advanced, unaccompanied by violence, threats, intimidation or coercion, does not amount in law to an illegal boycott. The statements being at most merely slanderous, come, we think, within the purview of the Bill of Rights (Sec. 4, Art. 2) of the constitution of the State of Illinois, which provides that "every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty . . . ."

In passing upon the right to ''freely speak, write and publish'' as guaranteed by the constitution, in *Vulcan Detinning Co. v. St. Clair,* 315 Ill. 40, our Supreme Court used the following significant language, at pp. 46, 47:

''In construing this order it is proper to assume that the chancellor intended to enter an order in harmony with the constitution, which declares that 'every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty.' If the order in question is construed to mean that appellant and other members of the union cannot refer to the nonunion men employed by appellee as traitors, then any discussion had by the strikers among themselves, in their meeting place or elsewhere, or any publication they might make or notice they might give, could be considered a violation of the injunction. If a court of equity has the power to restrain and punish members of a labor union from speaking, writing or publishing on the subject of a dispute between the union and the employer, then the members of the labor union are not such persons as are within the quoted constitutional provision. If the right of a union man, or any other man, to speak, write and publish freely on any subject is abused to the harm of another the remedy is an action for damages, and that remedy is deemed adequate. If the public suffers injury because of a malicious publication the remedy is by a criminal action for libel. The guaranty of this section extends as fully to the poorest as to the wealthiest citizen of the State. Though an abuse of the liberty so guaranteed may result in loss for which there cannot be adequate compensation, the American people believe that it is better that such be the result in isolated cases than that the liberty of speech be subject to the supervision of a censor.''

We have carefully examined all of the cases cited by plaintiff where an injunction was granted to restrain

the publication of a libel and find that the unlawful act amounting to intimidation, threats, coercion, conspiracy or boycott, was what was primarily enjoined, and the libel or slander merely as an incident of, or one of the means chosen for the accomplishment of the unlawful purpose. No case has been cited and we have been unable to find one that holds that the publication of a mere libelous or scandalous statement may be enjoined by a court of equity.

Were the alleged libelous and scandalous statements true or false?

It is logical to infer from the allegation in the complaint that "defendants . . . are conspiring and confederating . . . to coerce plaintiff and its employees into recognizing and accepting an alleged Dental Laboratory Workers' Union," that plaintiff's employees were not members of that union, that plaintiff was averse to having them join the union, and that plaintiff opposed and thwarted the union's attempt to organize its employees. Does it not reasonably follow that plaintiff is "non-union as far as organized labor is concerned," and that it refused its "laboratory workers permission to sign with organized labor" as stated in the broadcasts? This being true, we think that the defendant union was within its rights in publishing such facts. The statements that plaintiff was "unfair to President Roosevelt and the N. R. A." and was "operating in defiance of section A-1 of the National Recovery Act," we deem to be but fair comment in view of the facts and circumstances. The N. R. A., in so far as it attempted to regulate the relations between employer and employees, stood for "collective bargaining" as advocated by President Roosevelt, and it is difficult for us to understand how these references could be considered as libelous, scurrilous or defamatory.

In discussing the right of a union or its members to endeavor by peaceful persuasion to induce members

of the same craft to join their organization, and how far they may go in presenting their cause, in *Beck v. Railway Teamsters' Protective Union, supra,* the court said at pp. 516, 517:

"So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. Singly, or in combination, they have this right. They may organize in order to improve their condition and secure better wages. They may use persuasion to induce men to join their organization, or to refuse to work except for an established wage. They may present their cause to the public in newspapers or circulars, in a peaceable way, and with no attempt at coercion. If the effect in such case is ruin to the employer, it is *damnum absque injuria,* for they have only exercised their legal rights."

As to the union's right in a labor dispute to peaceably suggest and advise that an employer be not patronized, Justice Van Orsdel in his concurring opinion in *American Federation of Labor v. Buck's Stove & Range Co., supra,* said at pp. 116, 121–123:

"Applying the same principle, I conceive it to be the privilege of one man, or a number of men, to individually conclude not to patronize a certain person or corporation. It is also the right of these men to agree together, and to advise others, not to extend such patronage. That advice may be given by direct communication or through the medium of the press, so long as it is neither in the nature of coercion or a threat. . . .

". . . It is not unlawful for citizens to organize together for any of the main purposes for which the American Federation of Labor exists. It is not unlawful for that order to have an official organ; it is not unlawful for that organization, through the medium of that organ, to express freely its opinion as to the fairness or unfairness with which certain employers deal with their employees; and it is not unlawful for

the paper to contain advice to the friends of labor not to patronize such employer. Again, we do not assume that it will be contended that a citizen has not perfect freedom to deal with whom he pleases, and withhold his patronage for any reason that he may deem proper, whether the reason be one originating in his own conscience, or through the advice of a neighbor, or through the reading of an article in a paper. Neither would it be unlawful for such citizen to advise another not to deal with a person with whom he has concluded not to continue his patronage. If this advice may extend to one, it may to a hundred; and the thing done will not be actionable so long as it is in an expression of honest opinion, and not slanderous, however much the intercourse between this citizen and his neighbors may operate to injure the person against whom the advice is directed. . . .

"No one doubts, I think the right of the members of the American Federation of Labor to refuse to patronize employers whom it regards as unfair to labor. It may procure and keep a list of such employers, not only for the use of its members, but as notice to their friends that the employers whose names appear therein are regarded as unfair to labor. This list may not only be procured and kept available for the members of the association and its friends, but it may be published in a newspaper or series of papers. To this extent they are within their constitutional rights; at least, where a court of equity cannot intervene. But, as soon as, by threats or coercion, they attempt to prevent others from patronizing a person whose name appears on the list, it then becomes an unlawful conspiracy,—a boycott.''

The trend of modern judicial and legislative thought is to recognize the right of any party or person participating or interested in a labor dispute to give publicity to the existence of or the facts involved in such

dispute, and the Clayton Act (U. S. Anti-Injunction Statute) specifically prohibits the federal courts from issuing injunctions to prohibit such publication.

While the case of the *American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184, dealt with a strike and held picketing in that case unlawful, the reasoning of the opinion in the case is especially applicable to the questions involved here. The court said at p. 209:

"Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the stand-

ard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda, without more, to be without excuse and malicious.''

In the recent case of *Fenske Bros. v. Upholsterers International Union,* 358 Ill. 239, in which the Illinois anti-injunction act was declared to be constitutional and which is the latest expression of our Supreme Court on the question, the court upheld the right to peaceably and without threats or intimidation carry placards announcing a strike and that the employer was not employing union labor. Exhibition of the placards was certainly a publication of the matters contained thereon, and we think that the rule announced in that case is equally applicable to the facts in this cause.

We are impelled to hold that it is not unlawful for a labor organization in a radio broadcast to express freely its honest opinion as to the fairness or unfairness of the attitude of an employer toward organized labor and that it is not unlawful that such broadcast contain advice to the public and friends of union labor not to patronize such employer.

For the reasons indicated we are of the opinion that a court of equity had no jurisdiction to restrain the radio broadcasting of the statements set forth in the complaint. Therefore, the decree or order of the circuit court dismissing the complaint for want of equity is affirmed.

*Affirmed.*

SCANLAN, P. J., and FRIEND, J., concur.