## McALLISTER v TRUMBULL COUNTY BUILDING TRADES COUNCIL et

Ohio Common Pleas, Trumbull Co

Decided July 19, 1938

Guarnieri & Secrest and Jay Buchwalter, Warren for plaintiff.

Boyle, Boyle & Connor, Warren for defendant.

### OPINION

By GRIFFITH, J.

This action was brought for the purpose of obtaining injunctions, restraining the defendants from interfering with the plaintiff in entering into contracts with supply men and material men who furnish the plaintiff with materials used by him in construction work.

The plaintiff, for a period of years, has been engaged in the building and contracting business in and about Warren.

A contract between the plaintiff and the defendant, Trumbull County Building Trades council, which is an organization of the several crafts unions engaged in building operations, and whose function is to coordinate the activities of the various craft unions in Trumbull county, was entered into on March 25, 1937, which contract reads as follows:

"March 25, 1937.

"The undersigned hereby agrees to comply with the following conditions of the Trumbull County Building Trades Council.

"First: To recognize all trade agreements in effect recorded by the Trumbull County Building Trades Council, pertaining to wages and conditions.

"Second: He also agrees to employ all union men affiliated with said council. He further agrees to comply with the following conditions that shall prevail on all emergency maintenance work in the industrial plants, which must be performed on Saturday or Sunday.

"This type of work shall be classified as shift work, eight hours pay shall be received for seven hours labor on this type of work, with the exception of the cement finishers who shall be paid time and one-half for all Sunday work, under the above classification.

"This agreement will take effect immediately and will expire April 1, 1938.

"Signed Witness
"Temple McAllister C. V. Kincaid"

From the time the contract was signed down until about the first of the year 1938, the plaintiff employed all union men, paid union wages, observed union hours, and maintained satisfactory working conditions. There had, during this time, some matters arisen, with respect to the plaintiff, McAllister, violating the union rules in employing non-union help; but, apparently, those matters were ironed out to the satisfaction of both the union and McAllister.

In the fall of 1937, the plaintiff was called in to Trumbull County Building Trades Council; and a discussion was had, with respect to his purchasing lumber from the Moss Brothers Lumber Company of Conneaut Lake, Pa. The evidence disclosed that this lumber company had been declared unfair to union labor, by the Union Labor council at Meadville, Pa., and that this lumber company didn't employ union truck drivers in the delivery of its material.

It further appears that McAllister hired his brother-in-law to haul the lumber from Pennsylvania to Warren, purchasing a truck, and this driver joined the truck driver's union of Warren.

Effort was made to have Moss Brothers truck drivers join the union, but without avail; whereupon, McAllister was informed that he could no longer buy his lumber from the Moss Brothers Lumber Company, for the reason that this lumber company had been placed on the unfair list by the Building Trades Council at Meadville, and for the further reason that the truck drivers in the employ of Moss Brothers didn't belong to the truck driver's union.

At that time, McAllister had a contract with the lumber company for the purchase and delivery of perhaps $20,000 worth of lumber; a part of which had been delivered. McAllister refused to accede to the demands of the union representatives, to discontinue the purchase of lumber from Moss Brothers; whereupon the Building Trades Council ordered the various craftsmen off the McAllister jobs.

The stone masons, and some other of the craftsmen refused to return to work, and McAllister thereafter hired non-union masons, and perhaps other craftsmen, to proceed with the construction of the buildings which he had under contract; and since that time the plaintiff has gone forward with his construction work, employing men regardless of their union affiliations, some of them being members of the unions, others having no union connections.

On March 8, 1938, McAllister received notice that the Trumbull County Building Trades Council had declared him to be unfair against labor, and placed him upon the so-called "unfair list."

The trades council sent notices out to various building contractors, lumber dealers, material supply companies, about seventy (70) in all; notifying them that Mr. McAllister was unfair to union labor.

Hamilton & Meigs, a firm that had done business with McAllister for fourteen years, had been interviewed by representatives of the union; and requested to stop selling material to McAllister because he had been placed on the unfair list.

Hamilton & Meigs employed union truck drivers and found that the truck drivers were willing to make delivery of material to McAllister. Hamilton & Meigs refused to discontinue business connections with McAllister; and this firm likewise was placed on the unfair list, on March 8, 1938, and notices were sent out to seventy building contractors and supply houses of this action.

The Western Reserve Lumber Company, who had a contract with McAllister, for furnishing him lumber, were informed to make no deliveries to McAllister.

This company attempted to have their lumber delivered to McAllister by Komray & Bock, a local trucking concern; but this trucking concern was visited by representatives of the council, and instructed that it was the council's desire that they co-operate with the union in refusing to make deliveries to McAllister.

Leiby Brothers Coal & Supply Company likewise were notified that McAllister was on the unfair list; and they refused to make further deliveries to McAllister for fear that they themselves would be placed upon such a list.

The Peoples Ice & Supply Company, after receiving notice that McAllister was on the unfair list, said that they were unable to sell to McAllister; because their drivers would not make deliveries.

The Warren Hardware Company received notice by letter that McAllister was on the unfair list; and that Hamilton & Meigs had been placed on the unfair list; and this company was requested to refrain from making delivery of any materials to McAllister; and

Several other supply concerns testified along the same tenor.

It is the contention of the plaintiff in this case, that the defendants have created an unlawful boycott by coercing concerns and business houses having dealings with the plaintiff; and that their activities have been in violation of the Valentine anti trust act.

The defendant's position is that the plaintiff McAllister does not come into court with clean hands; and that the defendant's conduct has been lawful, persuasive only, and peaceable.

The main question to be determined in this action is: Whether the defendants may, in their effort towards success in their dispute with McAllister, place supply houses, like Hamilton & Meigs, and the Warren Hardware Company, on the unfair list, upon such supply house's refusal to withdraw from selling and delivering materials to McAllister.

There has been no labor dispute of any character between the supply concerns and the defendants.

The dispute in this case is between McAllister and the unions.

McAllister is now employing both union

and non-union men; and this is violative of his contract.

Did the union have a right to put McAllister on the unfair list, because he insisted upon purchasing lumber of the Moss Lumber Company, which had been declared unfair to union labor?

Was it unlawful to send the written notices to the supply houses; that the plaintiff had been declared unfair?

There are authorities on both sides of these questions.

The matter that lies at the foundation of this proceeding is a dispute between the union and McAllister. He is using lumber from a non-union lumber concern in Pennsylvania; he has been hauling it to his jobs in Warren with a union truck driver; the union objects to this.

The plaintiff insists upon purchasing and using this lumber; and, for that reason, the union placed him on the unfair list; and called the various workers off the jobs.

Thereupon, the plaintiff advertised for non-union masons, and has, since that time, been using both union and non-union men.

Following that difficulty, the union went to Hamilton & Meigs, a third party, who has been selling building materials to McAllister for fourteen years; and sought to have Hamilton & Meigs withdraw from doing business with the plaintiff. In so doing, the union placed Hamilton & Meigs in the position of taking sides in this controversy; in which Hamilton & Meigs, and all of the other supply houses have no interest.

True it is that Hamilton & Meigs has a contract with the teamsters' union, but that does not make them a party in any wise to the disagreements and disputes between the union and McAllister.

The union being unable to persuade Hamilton & Meigs to agree to withdraw its business from the plaintiff, thereupon placed Hamilton & Meigs upon the unfair list, notwithstanding the fact that Hamilton & Meigs, at all times, was in good standing with its union truck drivers.

The reason why Hamilton & Meigs was placed on the unfair list was their refusal to stop business with McAllister; in other words, Hamilton & Meigs have been placed on the unfair list because they sell to McAllister, with whom the union has a disagreement, and they have been placed on that list for the purpose of forcing McAllister to force the Moss Lumber Company to yield to the demands of the Meadville union.

The union did not act from actual personal malice toward the plaintiff, nor toward Hamilton & Meigs, nor any of the other supply concerns; but their acts were done in pursuance of their union principles and purposes.

Where a window cleaning company maintained an open shop, and did not discriminate in favor of or against union labor, it was held that the unions were not entitled to picket the places of business of plaintiff's customers for the purpose of compelling the plaintiff to employ union labor exclusively.

Commercial House & Window Cleaning Company v Awerkin, 240 N. Y. S. 797 (March 1930).

A dealer in masons' supplies was held to be entitled to an injunction, restraining members of the union from declaring the plaintiff to be unfair, because he continued to furnish supplies to a building contractor who had been declared to be unfair by the union. Burnham v Dowd, 217 Mass. 351 (1914).

In the case of Goldfinger v Feintuch, 11 North Eastern Reporter, 2d Series, page 910, decided December 7, 1937, the court said: "Likewise it is illegal to picket the place of business of one who is not himself a party to an industrial dispute to persuade the public to withdraw its patronage generally from the business, for the purpose of coercing the owner to take sides in the controversy in which he has no interest."

In the case of Sontag Chain Stores Co. Ltd. v P. M. Connoly et al, decided in the Superior Court of California, Los Angeles County, on July 1st, 1938, being case 428,-985, the court held in substance that the right to picket, when a strike is in progress, is limited to the place of business of the employer, in this case the newspaper; and that advertisers can not be picketed for the purpose of forcing them to withdraw their advertising from a newspaper whose employees are on strike.

It is the contention of the plaintiff that the real reason for his being placed on the unfair list, and subsequently calling men off his work, was that he purchased lumber at a cheaper price outside the state.

The right of the men to quit work for McAllister is fundamental, and they may choose those persons for whom they desire to work.

The plaintiff's view is that the defendants were seeking to force him, against

his will, to cease buying lumber from the Moss Brothers.

Now, the plaintiff has a right to buy lumber from whomsoever he wishes, without hinderance, and without being interfered with.

The portion of the General Code which is applicable to this case is found in §6391, which reads in part as follows: "A trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations, or associations of persons, for any or all of the following purposes.

1. To create or carry out restrictions in trade or commerce;

2. To limit or reduce the production or increase, or reduce the price of merchanrise or a commodity;

3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or a commodity;

5. To make * * * contracts * * * of any kind or description, by which * * * they agree to pool, combine or directly or indirectly unite any interests which they have connected with the sale or transportation of such article or commodity, that its price might in any manner be affected. Such trust as is defined herein is unlawful, against public policy and void."

Have the defendants, under the facts developed by the evidence, combined to create, or carry out restrictions in trade; or prevent competition in transportation of merchandise? Have they united in interest directly or indirectly, in connection with the sale of articles of commodity?

It appears to this court that the kernal of the complaint of the defendants against McAllister is as to the commodity, that is the lumber; and not as to the individuals. It is a commodity that, in the minds of the defendants, is branded as an unfair commodity, by reason of the fact that it is coming from a company that has been declared unfair to the best interests of union labor.

A labor union may request the public to refrain from buying a product made by non-union labor, by picketing a contractor who uses such product; although that contractor operates only with union labor.

The employees of that contractor have a right to refuse to work for him, if he insists upon using non-union products; they may aid its cause in that respect.

In other words, a union may, in a proper manner, and in a peaceful way, ask the public to refrain from purchasing products made by non-union labor; and state where the same was sold.

In the case of State v Jacobs, 7 O. N. P. 261, the court said: "A combination by two or more persons for the purpose of boycotting a third person is a combination to create and carry out a restriction in trade and commerce and is a violation of said act. The act while originally and primarily intended to suppress and control what are known as trusts and monopolies, is still so comprehensive and far-reaching in its express terms as to extend to every combination by two or more individuals by their capital, skill or acts to create or carry on any restriction in trade or commerce. The boycott is undoubtedly such a combination by individuals for the purpose of creating and carrying out a restriction in trade. Its avowed purpose is to prevent dealing between certain individuals. It is restriction of hinderance created by application of external force, to-wit: by fear of injury to the business or property of the person threatened. and is distinctly a violation of the provisions of the act."

In the case of Gildehaus Co. v Busse & Borgman Co., 19 O. N. P. (N.S.) 263, the court says: "But a combination of persons formed for the purpose of boycotting those who refuse to become members of their oganization and the further combining of such organization with a labor union in furtherance of said boycott, whereby an attempt is made to prevent the public from dealing with said non-members on account of their alleged unfairness toward union labor, is a combination to create or carry out restrictions in trade or commerce within the meaning of the Valentine Anti Trust Law."

In the case of Duplex Printing Press Co. v Deering, 254 U. S., 443, the court said: "The substance of the matters here complained of is an interference with complainant's interstate trade, intended to have coercive effect upon complainant, and produced by what is commonly known as as 'secondary boycott'; that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain, but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from com-

plainant through fear of loss or damage to themselves should they deal with it."

In the case of Beck v Teamsters' Protective Union, 77 N. W. 13, the court held: "Organization into unions by workingmen for the securing of better and uniform wages, and the use of persuasion to induce other workingmen to join the union, and to refuse to work except for the established wage, and the presentation of their cause to the public in newspaper or circulars, in a peaceable way and with no attempt at coercion, are lawful.

But the boycotting of one who refuses to accede to the demands of the union is unlawful, where the means used to prevent persons from dealing with the person boycotted are threatening in their nature, and tend naturally to overcome, by fear of loss of property, the will of others, and compel them to do what they would not otherwise do, though unaccompanied by actual violence or threats of violence. Injunction will lie to restrain a combination of persons from attempting to ruin complainant's business by bringing to bear upon his customers and employees intimidating and coercive means."

Barr v Trades Council, 53 N. J. Eq., 101; Auburn Draying Co. v Wardell, 277 N. Y. 1; Moores & Co. v Bricklayers' Union, 10 O. D. Reprint 665.

Judge Reynolds, in the case of Anderson v Local Union No. 413 et al, in Common Pleas Court of Franklin County, Ohio, February 10, 1938, says: "No one can seriously question the beneficial results which have been accomplished by the joint efforts of labor in the form of unions. Hours of labor have been decreased, wages increased, working conditions immeasurably bettered, social conditions improved, but still leaving much to be desired. There was a time in the country and not so long ago when the laborer was compelled to work ten and even twelve or more hours per day, with small pay and under unfavorable conditions as to sanitation, safety, etc. The greed and selfishness of the employer was always in the way of improvement and labor was compelled to fight for every concession, and the present eight hours per day, favorable working conditions, safety appliances, compensation for injuries received during the course of employment, medical attention, better social advantages, etc., are largely due to union organizations and their efforts in behalf of labor.

But sometimes the zeal to accomplish the results desired causes those interested to lose sight of the rights of others and so to disregard them. Care should always be taken to avoid improper actions to reach a laudable objective. The ends, however desirable and right, can not justify improper means to attain the same, but the rights and property of others must ever be respected. The fact that the employer has in the past evidenced a spirit of selfishness in opposition to the demands of labor can not justify labor in being guilty of like offenses. There must be some middle ground between the extreme positions which employers have taken in the past and the opposite extreme to which labor sometimes goes, where all can meet and peaceably and rationally settle and compromise all matters in dispute. Surely agreements thus reached must be more satisfactory and lasting than those which are entered into, by means of threats, intimidation or coercion, and surely those men who are without the ranks of the unions, will make better members and be of greater benefit to organized labor if they are brought in through appeals to their reason and intelligence than to be forced in against their wills. It is therefore to be earnestly hoped that the parties directly interested herein shall meet and 'reason together' and if possible come to an amicable agreement of their differences, and that they at all times do not lose sight of the very vital interest the public has in their controversies and that such interest have weight in their deliberation."

In disposing of this case it is the duty of this court to decide it upon established principles and rules; and this court is not empowered to initiate new powers or privileges to either party, that is a legislative not a judicial function.

There has been no violence in this case, and no threats thereof. The acts of the defendants have created a secondary boycott; and the temporary order heretofore issued should be modified.

The defendants should be enjoined from enforcing a secondary boycott, or from restricting trade.

IT IS THEREFORE ORDERED, That the defendant be enjoined from circulating any resolutions, or actions, tending to interfere with the plaintiff in entering into contracts with supply men and material men, who furnish the plaintiff with materials; and from interfering with such material men and dealers in building supplies, in the transportation of such supplies and materials to building sites in and

around Warren; and from, in any manner, coercing these supply men and concerns from doing any business with the plaintiff; and

The defendants are enjoined from using any intimidation measures to the supply concerns in and about Warren, tending to cause them to withdraw their business from the plaintiff;

Otherwise, the injunction heretofore issued is dissolved.